IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIE LEE WILSON AND<br>3810 Streamwood Drive,<br>Hazelcrest, Illinois 60429.<br><br>WILLIE WILSON 2016<br>345 East Wacker Dr., Suite 4601,<br>Chicago, Illinois, 60601<br><br>Plaintiffs,<br><br>v.<br><br>DNC SERVICES CORPORATION,<br>d/b/a DEMOCRATIC NATIONAL<br>COMMITTEE,<br>430 S. Capitol Street, S.E.<br>Washington, D.C. 20004<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.<br><br>1:17-cv-00730 - TNM |

## PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES

COME NOW Plaintiffs, WILLIE WILSON AND WILLIE WILSON 2016, by and through undersigned counsel, and hereby file this Complaint for Damages against **DNC SERVICES CORPORATION, d/b/a DEMOCRATIC NATIONAL COMMITTEE** (hereinafter referred to as "the DNC") on the following grounds: common law breach of implied contract, promissory estoppel and race discrimination in violation of 42 U.S.C. § 1981 *et seq*. and §1985.

## NATURE OF THE CASE

Willie Lee Wilson, a Chicago, Illinois based African-American entrepreneur, philanthropist, and religious motivational speaker, qualified and ran for President of the United States in the 2016 presidential election via his Presidential Campaign Committee.  (See Exhibit

"A", FEC Form 1).

Defendant, the Democratic National Committee, supports and facilitates Democratic candidates' presidential campaigns throughout various state primary elections and the national Democratic convention in which its party's presidential candidate is selected. Upon registering and qualifying as a national presidential Democratic candidate, and as a stalwart party supporter for decades, Candidate Wilson accepted the DNC's campaign conditions, rules and regulations. An implied contract was created when the DNC promised it would provide certain information and services to Dr. Wilson's campaign, just as it does for other campaigns. In return Dr. Wilson would abide by the rules and regulations of the DNC.

Accordingly, he, like other candidates, expected the DNC's support, logistical assistance, guidance, resources, and access to certain information for his campaign. While requiring Candidate Wilson to accept its conditions and to follow its rules and regulations, the DNC failed to uphold its end of the bargain and instead met his campaign with coldness and adversity. The DNC intentionally denied Candidate Wilson equal logistical assistance and guidance, resources, and access to certain information while simultaneously providing such to similarly situated White presidential candidates.

## JURISDICTION AND VENUE

1.      There are two (2) sources of subject matter jurisdiction in this Court. First, the parties' citizenship is completely diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and costs pursuant to 28 U.S.C. §1332. Plaintiffs are citizens of the State of Illinois. The Defendant is a citizen of the District of Columbia ("hereafter "DC") by virtue of its incorporation in that jurisdiction, and maintains its principal place of business within DC. Second, this matter involves rights and privileges afforded to Plaintiffs under federal law and adjudication of those

rights involves a federal question, per 28 U.S.C. §1331.

**2.**       This Court enjoys venue because: (1) Defendant's principal place of business is in DC and the acts complained of occurred in DC among other places.

## THE PARTIES

3.       Plaintiff, WILLIE LEE WILSON, (hereinafter "Candidate Wilson") is an African-American male individual and citizen of the state of Illinois.  Candidate Wilson resides at 3810 Streamwood Drive, Hazelcrest, Illinois 60429.  Plaintiff, WILLIE WILSON 2016, (hereinafter referred to as "the Campaign Committee") is Plaintiff's campaign committee. It was formally registered with the Federal Elections Commission ("FEC") for purposes of qualifying for the 2016 campaign for the Office of the President of the United States. Its principal place of business was located at 345 East Wacker Dr., Suite 4601, Chicago, Illinois, 60601.

4.       Defendant DNC Services Corporation, d/b/a Democratic National Committee (the "DNC") at all times relevant hereto was, and is, a not-for-profit corporation organized under the laws of the District of Columbia. It is the formal governing body for the United States Democratic Party. As such, it coordinates strategy to support Democratic Party candidates throughout the country for local, state, and national office. It also organizes the Democratic National Convention held every four (4) years to nominate and confirm a candidate for president, and to formulate the party platform. The DNC is composed of the chairs and vice-chairs of each state Democratic Party committee and over 200 members elected by Democrats in all 50 states and the territories. Its chairperson is elected by the committee. The DNC was established at the 1848 Democratic National Convention.[1] The DNC's main counterpart is the Republican National Committee. The DNC, as a non-governmental entity, offers logistical support to the particular campaign activities of its party's political candidates and thus creates a contractual relationship between itself and the

party's varied candidates.

## FACTS COMMON TO ALL CLAIMS

### Candidate Willie Lee Wilson's Rags to Riches Story

5.      Candidate Willie Lee Wilson hails from humble beginnings in the State of Louisiana, where his father was a sharecropper. As a teenager, he worked in cotton and sugar cane fields and eventually migrated to Chicago, Illinois where with direct assistance from Ray Kroc, the then national Chief Executive Officer of McDonald's Corporation, he was able to open his first McDonald's Restaurant. Candidate Wilson arose from sweeping floors and flipping burgers in McDonald's restaurants to owning five (5) McDonald's restaurants, and ownership of a distribution company with offices in Shanghai and Beijing, China. Wilson is the recipient of a Doctor of Divinity degree from Mt. Carmel Theological Seminary, a Doctor of Humane Letters from Chicago Baptist Institute International, Honorary Doctorate in Humanitarianism from Swisher Bible College and a Doctorate in Humanitarianism from Denver Institute of Urban Studies and Adult College.

6.      Candidate Wilson, a motivational speaker with a strong Christian faith, is a strong advocate of governmental accountability, equal justice, business development and social and economic opportunity. The Wall Street Journal described him as follows: "Mr. Wilson is a rare bird on the American landscape- a self-made black millionaire and philanthropist. Neither a sports hero nor a celebrity, he has made his money the old-fashioned way, as a quintessential can-do American in an America that hasn't always been kind to his aspirations."

7.      Given his African-American background, and his message, which embraced his religious convictions and beliefs, Candidate Wilson's Presidential campaign presented a threat to the DNC leadership's intended objectives, which was to ensure Hillary Clinton's nomination as the

democratic presidential candidate. Candidate Wilson's candidacy potentially attracted prospective African-American and other voters away from Hillary Clinton in multiple close political races, and particularly in the ten (10) states in which Plaintiff qualified to be on the presidential ballot.

8.      The DNC was fully apprised of Candidate Wilson's candidacy and understood the implications of an African-American "rags to riches" candidate with a strong Christian background and keen sensibility to working and middle-class Americans, and in particular African-American voters.

9.      DNC leadership thus viewed Candidate Wilson's race and the potential racial implications of his candidacy as a threat that needed to be constrained and nipped in the proverbial bud. Hence, it imposed a racially biased double standard in its treatment of Candidate Wilson's campaign, which stifled and contained its development. The DNC's actions thus violated anti- discrimination laws rooted in 42 USC § 1981, et seq. 1985, as amended.

### Candidate Willie Lee Wilson and the DNC
### Implied-in-Fact Contract

10.     On May 13, 2015, the Federal Elections Commission (hereafter "FEC") formally accepted registration of the Plaintiff Willie Wilson's Campaign Committee.

11.     The DNC operates pursuant to an established set of conditions and rules by which any Democratic Party candidate necessarily agrees to be bound. Upon establishing his candidacy, Candidate Wilson accepted the DNC's terms and conditions for running as a democratic candidate for President of the United States.

12.     An implied-in-fact contract was created between the parties when, as consideration for Candidate Wilson's acceptance of its terms and conditions, the DNC promised to provide

Candidate Wilson with certain resources, logistical guidance and information in order to facilitate having his name placed on state ballots as a Democratic candidate during the primaries.

13.     An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement except that it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties within the context of the relationship between the parties.

14.     The DNC promised Candidate Wilson that it would introduce him to the political leadership in state democratic parties.   Such introductions constituted a significant benefit to candidates.   A candidate's name is placed on the state ballots as determined by and consistent with a state's Democratic party committee rules which are in turn, approved by the DNC.

15.     Another significant benefit from the DNC for presidential candidates was access to the DNC's Voter Data File System, a major, if not essential, DNC resource provided to candidates. The Data File System is a vital information composite and national list of all registered Democrats, which candidates used for purposes of voter education, voter outreach, voter registration, and get out the vote ("GOTV") efforts.

16.     The DNC also facilitated candidate meetings and attendance at conventions and forums around the country including, but not limited to, debates and town hall meetings.

17.     The DNC also created and breached an implied and an express "covenant of neutrality." In the context of political campaigns, the DNC, by custom and tradition, holds itself out to act as a neutral facilitator between competing candidates of the same party who vie for the party's nomination to a particular office.

18.     The DNC is governed by the Charter and Bylaws of the Democratic Party. These governing documents expressly obligate the DNC to maintain a neutral posture with respect to

candidates seeking the party's nomination for President during the nominating process.   Article

5, Section 4 of the Charter states:

> *The National Chairperson shall serve full time and shall receive*
> *such compensation as may be determined by agreement between the*
> *Chairperson and the Democratic National Committee. In the conduct and*
> *management of the affairs and procedures of the Democratic National*
> *Committee, particularly as they apply to the preparation and conduct of*
> *the Presidential nominating process, the Chairperson **shall exercise***
> ***impartiality and evenhandedness** as between the Presidential candidates*
> *and campaigns. The Chairperson shall be responsible for ensuring that the*
> *national officers and staff of the Democratic National Committee*
> ***maintain impartiality and evenhandedness** during the Democratic Party*
> *Presidential nominating process.*

19.     Thus, pursuant to its own Charter and Bylaws, as an objective facilitator among

candidates pursuing the same goal, the DNC operates subject to a "covenant of neutrality"

mandating that the DNC remain even-handed, operating at arms-length distance from each

candidate.  Candidate Wilson and his Willie Wilson 2016 campaign team were intimately aware

of the terms and conditions of running as a Democratic candidate as set forth in the DNC Charter

and Bylaws.

20.     Under the administration of Debbie Wasserman Schultz, National Chairperson of the

DNC, the DNC breached its covenant of neutrality during the 2016 Democratic Presidential

Primary when it showed unequivocal favor and partiality toward one candidate, Hilary Rodham

Clinton ("HRC").

21.     Incontrovertible evidence of the DNC's bias and favor towards HRC was disclosed

subsequent to the computer breach of the DNC's computer network by "Guccifer 2.0."  Hackers

posted several documents purportedly taken from the DNC's servers on a publicly accessible

website.  The DNC has never denied the authenticity of these documents.

22.     Among documents released by "Guccifer 2.0" was a memorandum dated May 26, 2015,

addressed to the DNC which set forth "a suggested strategy for positioning and public messaging around the 2016 Republican presidential field," including use of "specific hits to muddy the waters around ethics, transparency and campaign finance attacks on HRC."

23.     "Our goals in the coming months will be to frame the Republican field and the eventual nominee early and to provide a contrast between the GOP field and HRC", stated the memorandum.

24.     The memorandum single-mindedly focuses on how best to assist HRC; no other candidates are mentioned.

25.     According to the memorandum, "the right wing attack machine has been building its opposition research on Hillary Clinton for decades. HRC's critics have been telegraphing they are ready to attack and do so with reckless abandon."

26.     As a tactical response, the memorandum suggests "[w]orking with the DNC and allied groups" to "help pitch stories with no fingerprints and utilize reporters to drive a message" and "insert our messaging into [Republican] press."

27.     Indicative of the seriousness of this breach of the covenant of neutrality are the comments of former DNC Chairperson, Terry McAuliffe, upon reading the DNC emails leaked by Wikileaks concerning comments by DNC staffers regarding candidate Bernie Sanders, wherein he was quoted as follows:

> "*You've got to run a level playing field. It's not fair what they wrote about Sen. Sanders; it's outrageous.  If I had been there and seen somebody on my staff write that against Al Sharpton or (Howard)Dean or John Kerry or all the folks who ran when I was there, I would have fired them on the spot. You just can't do that; your neutral." See Exhibit "H"* *http://www.mcclatchydc.com/news/politics-government/election/article92129042.html* *(last viewed 4/18/2017)*

28.     Also implied in all contracts is a covenant of good faith and fair dealing which requires

each party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.

### The DNC's Racial Discrimination Against Candidate Wilson

29.   Additionally, at all times referenced herein, Defendant DNC maintained an anti-discrimination policy and practice, which prohibited among other things, racial discrimination in its rules, policies, and the provision of its services and resources.

30.   Section VI of the DNC's official Call for the 2016 Democratic National Convention defines the term "presidential candidate" as follows:

> The term "presidential candidate" herein shall mean any person who, as determined by the National Chairperson of the Democratic National Committee, has accrued delegates in the nominating process and plans to seek the nomination, has established substantial support for his or her nomination as the Democratic candidate for the Office of the President of the United States, is a bona fide Democrat whose record of public service, accomplishment, public writings and/or public statements affirmatively demonstrates that he or she is faithful to the interests, welfare and success of the Democratic Party of the United States, and will participate in the Convention in good faith. (See Exhibit "G", Section VI, p. 7).

31.   At all times referenced herein Candidate Wilson's campaign committee was represented by attorney Andrew Finko ("hereafter "Attorney Finko").

32.   By letter dated May 29, 2015, Attorney Finko formally notified the DNC of the Plaintiff's registration with the FEC and sought campaign support and general information on the Democratic Party's nominating process. (See Exhibit "B").

33.   Attorney Finko's May 29, 2015 letter also introduced the DNC to Candidate Wilson's background.   The DNC neither acknowledged his letter; nor did it respond to it.  This was the first indication of the DNC's indifference to his campaign.

34.   On July 6, 2015, Attorney Finko sent an email to Amy Dacey, (hereafter "Ms. Dacey") the DNC's Chief Executive Officer, pertinent to his earlier May 29th correspondence hoping to

engender a more meaningful and warmer response.  (See Exhibit "C).

35.     On July 7, 2015, Ms. Dacey responded for the very first time to Candidate Wilson's request for information and assistance by email. (See Exhibit "D").

36.      In this email, she provided the Rules on Delegate Selection, the Delegate Allocation Chart, etc.

37.     The DNC, by way of her correspondence, promised to provide assistance to Candidate Wilson in the form of introductions to State Party officials, logistical resources, and general political assistance for his emerging Presidential campaign.

38.     She made no mention, however, about the DNC's Voter Data File System.

39.     Candidate Wilson relied upon Ms. Dacey's promises and representations.

40.     In reliance upon these promises and representations he sought to organize and develop his national campaign in which he personally invested considerable resources.

41.      At the earliest stages of his campaign Candidate Wilson experienced additional DNC resistance when his campaign sought to participate in State and DNC sponsored events in the primary election processes.

42.      Upon information and belief, with the support and encouragement of the DNC, State party officials repeatedly chilled Candidate Wilson's campaign efforts.

43.      Democratic State Party officials repeatedly told him and his campaign workers that the DNC had advised them that he was not a DNC "sanctioned" candidate.

44.      After encountering several apparent exclusionary practices, on August 12, 2015, Mr. Wilson issued a press release in which he publicly challenged the discriminatory treatment that he experienced at the hands of the DNC.  (See Exhibit "E").

45.      In August, 2015, the DNC held a weekend summer conference in Minneapolis,

Minnesota, for 2016 Democratic presidential candidates, including Hillary Clinton, Bernie Sanders, Martin O'Malley, Lincoln Chafee and Jim Webb, all of whom were White candidates.

46.     Candidate Wilson nevertheless attended the conference.

47.     The DNC advised him, however, that his candidacy and campaign would not be allowed to participate in any scheduled events and further, that he would not be recognized as a Democratic candidate at the event.  Each such event provided meaningful publicity and credibility to candidates' campaign efforts.

48.     Only White candidates were allowed to attend and to speak at the DNC's Minneapolis event.

49.     Candidate Wilson encountered similar resistance from Democratic State Party Committee officials in almost every state in which his campaign, via staff and volunteers, attempted to gain state ballot access.

50.      Candidate Wilson was routinely advised that this campaign would not be allowed State ballot access because it was not "sanctioned" by the DNC.

51.     Mr. Wilson attempted to register as a Presidential Candidate in the following states: California, Mississippi, Texas, Iowa, South Carolina, New York, Ohio, New Hampshire, Florida, Louisiana, Alabama, Illinois, Michigan, Nevada, Maryland, Missouri, North Carolina, Georgia, and in Washington, DC.

52.     He successfully attained ballot access in South Carolina, Mississippi, Iowa, California, Louisiana, Texas, Missouri, Nevada, and Illinois.

53.     In Mississippi, he was required to file a legal action in order to gain ballot access after the State party denied him such.

54.     The Mississippi Supreme Court intervened and reversed lower court rulings thereby

requiring his investment of additional resources to successfully achieve ballot access.

> *"We grant Dr. Wilson's petition for interlocutory appeal and order the Secretary of State to add Dr. Wilson's name to the electronic Statewide Election Management System, so that it may be made available through electronic voting machines for the Democratic primary on March 8. We also order that any voting precincts using paper ballots for the March 8 election prepare ballots that include Dr. Wilson as a candidate. However, Dr. Wilson's name shall not be added to any absentee ballots prepared or issued to voters.   In this way we insure that military and overseas voters use the same ballot as local absentee voters. Finally, we accept Dr. Wilson's express waiver of any right to challenge absentee ballots going forward.  No motion for rehearing will be allowed and the Clerk of Court is directed immediately to issue the mandate."* (See Exhibit "F", attached at pp. 19 -20).

55.    Candidate Wilson's inability to gain access in other states was substantially attributed to the DNC's influence and the minimization of Plaintiff's candidacy and campaign efforts including, but not limited, to its communications with State Party Committee officials that Plaintiff was not a "sanctioned" candidate for the Office of the President of the United States.

56.    Debbie Wasserman Shultz ("Ms. Wasserman-Shultz") was the DNC's National Chairperson at the time of its August 2015 summer conference in Minneapolis.

57.    During that conference, Ms. Wasserman Shultz met with the Plaintiff's representative, Charles Steele, then President of the Southern Christian Leadership Conference, regarding the DNC's treatment of the Plaintiff's campaign, who apprised her of and discussed Candidate Wilson's campaign.

58.    Ms. Wasserman Shultz, despite being apprised of Candidate Wilson's difficulties with the DNC, did nothing to rectify the situation.

59.    The DNC selectively entered licensing agreements with presidential campaign committees, specifically titled: "Agreement Between the DNC and Presidential Campaign Committees Regarding Use of DNC National Voter File Data" (hereinafter referred to as "the Voter Data Licensing Agreement" or "Agreement"). Pursuant to this Agreement, respective

candidates enjoyed access to a national computerized compilation of registered democratic voters across the nation.

60.     The Voter Data Licensing Agreement was thus vital to meaningful fundraising and voter identification efforts for all Democratic presidential candidates.

61.     Upon information and belief, White Democratic presidential candidates enjoyed the benefit of its license agreement relationships and corresponding use of the DNC National Voter File Data.

62.     The DNC did not provide the same contractual/license opportunity and benefit to Candidate Wilson.

63.     As a result, only White presidential candidates enjoyed access to the DNC's Voter Data File including, but not limited, to: demographic and geographic data for registered voters such as their name; addresses; and voting jurisdiction; email addresses; voter registration status; telephone numbers; voting history; commercially acquired consumer data; ethnicity information; political party preference or affiliation, if any; candidate preference data, if any; and other key analytic metrics selected by the DNC.

64.     On December 18, 2015, the Bernie Sanders Presidential Campaign filed a lawsuit against the DNC in which it sought specific performance and breach of contract damages in connection with the subject licensing agreement.

65.     Candidate Wilson invested considerable financial resources of over $1,000,000.00 in his bid for the presidency; notwithstanding that he formally qualified as a candidate, he had to consistently challenge the DNC and its state organizations for equal access and equal treatment of his candidacy.

66.     The DNC's failure to offer the Plaintiff equal access to its Voter Data File, as it did to

other similarly situated White Democratic candidates, was specifically designed and orchestrated

to hamper and impede Candidate Wilson's ability to compete for votes on a level playing field and

thereby expose the democratic electorate to the substance of his values and platform.

<u>**COUNT I**</u>

**BREACH OF IMPLIED-IN-FACT CONTRACT**
**Covenant of Neutrality**
**Covenant of Good Faith and Fair Dealing**

67.     Paragraphs 5 through 66, Facts Common to all Claims, above, are hereby incorporated

as though each of the factual allegations was restated herein.

68.     The DNC created, and breached, an implied "covenant of neutrality."  In the context of

political campaigns, the DNC, consistent with its charter and by-laws traditionally acts as a neutral

facilitator among candidates of the same party vying for the party's nomination to a particular

office.

69.     As an objective facilitator among candidates pursuing the same goal, the DNC operates

subject to a "covenant of neutrality" mandating that the DNC remain even-handed, operating at

arms-length distance from each candidate.

70.     Also implied in all contracts is a covenant of good faith and fair dealing which requires

each party to refrain from doing anything to injure the right of the other to receive the benefits of

the agreement.

71.     It has been publicly reported that: (1) the Defendant, along with then candidate Hillary

Clinton, funded opposition research which resulted in a dossier on then candidate Donald Trump;

and, (2) as revealed by former DNC interim chairperson, Donna Brazille, the Defendant entered

into a secret funding agreement with then candidate Hillary Clinton, in August of 2015, almost a

year prior to her being selected as the party's nominee, wherein she controlled the DNC's funding,

communications, staffing, strategy and logistics. If true, these actions on the part of the DNC indicate facial plausibility of the Plaintiffs' claims that the DNC participated with the Hillary Clinton campaign to control its actions to the detriment of other candidates.[1]

72.     Defendant DNC breached the implied covenants of neutrality, and the covenant of good faith and fair dealing by showing partiality to a particular candidate and by refusing to accord Plaintiffs the benefits of the relationship they should have enjoyed as participants in the 2016 Democratic Presidential Primary for the Office of the President of the United States.

73.     As a result of Defendant's breach of these implied covenants Plaintiffs suffered significant financial harm to which they are entitled to be compensated.

## COUNT II

### PROMISSORY ESTOPPEL

74.     Paragraphs 5 through 66, Facts Common to all Claims, above, are hereby incorporated as though each of the factual allegations was restated herein.

75.     The DNC, early on, promised to provide assistance to Candidate Wilson in the form of introductions to State Party officials, logistical resources, and general political assistance for his emerging Presidential campaign.

76.     The DNC's representations and promises to Candidate Wilson reasonably induced Plaintiffs to rely on those promises. Candidate Wilson invested significant resources in the development of its presidential campaign based upon the DNC's representations.

77.     Notwithstanding its representations upon which Plaintiffs relied, the DNC failed to provide the promised benefits, services and information to Plaintiffs thereby creating a significant

---

[1]     https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-3470754bbb9_story.html?utm_term=.e3ea344c8b6e

detriment to Plaintiffs.

78.     Defendant's breach of its promises caused substantial financial harm to Plaintiff's campaign.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF
### EQUAL RIGHTS UNDER THE LAW
### 42 USC § 1981

79.     Paragraphs 5 through 66, Facts Common to all Claims, above, are hereby incorporated as though each of the factual allegations were restated herein.

80.     42 USC §1981 provides that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts regardless of race.

81.     The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 USC §1981(b).

82.     The DNC, as a non-governmental entity, provides logistical support and assistance to the particular campaign activities of its party's political candidates and thus creates an implied contractual relationship between itself and the party's varied candidates. Withholding and limiting the resources it provides to a candidate can negatively harm a candidate's campaign and encroach upon the candidate's complete and full enjoyment of the contractual relationship, which is the asserted case here.

83.     The DNC operates through state party committees which implement its policies and directives at the various state levels subject to both DNC directives and rules, as well as the state party's own rules and policies which are adopted subject to DNC approval.

84.     Upon information and belief, DNC staff members, agents, and/or employees

16

communicated directly (via emails and otherwise) with State Democratic Party Committee members and officials regarding Candidate Wilson's campaign, and the extent to which said campaign should not be recognized, not given access to information, and not allowed to participate in party events.

85.     As a result, Candidate Wilson encountered regular hurdles and resistance to his candidacy including, but not limited to racially biased unequal access to information, unequal access to debates and/or candidate fora, party events and meetings, and logistical campaign information, such as the above referenced voter identification information. Additionally, Defendant and/or its agent's actions impeded Candidate Wilson's access to and listing on state presidential ballots.

86.     Candidate Wilson was qualified to receive the benefits DNC provided the White presidential candidates.   Notwithstanding his meeting federal registration requirements and communicating directly with the DNC regarding his campaign, the DNC refused to sanction his candidacy and to treat it equally in any formal respect beginning with basic communications, and information access, thereby depriving him of the same right as his fellow White candidates to enter into contractually based relationships with the DNC.

87.     As just a couple of specific examples, the DNC never recognized Candidate Wilson's campaign on its website, nor allowed him the benefit of licensing its National Voter Data File, as it did for similarly situated White candidates.

88.     The DNC, therefore, intentionally and maliciously violated the Plaintiffs' rights under 42 USC §1981 to make and enforce contracts on the same basis as White persons and caused Plaintiffs substantial financial harm, and in the case of Plaintiff Willie Wilson, humiliation, embarrassment, and mental anguish and frustration.

89.     Plaintiffs are thus entitled to compensatory damages in an amount to be proven at trial,

but not less than all amounts expended by the Plaintiffs in pursuit of the Office of the President of the United States.

## COUNT IV

### CIVIL CONSPIRACY
### 42 USC § 1985

90.     Paragraphs 5 through 66, Facts Common to all Claims, above, are hereby incorporated as though each of the factual allegations was restated herein.

91.     42 USC §1985 provides, in part, that no two or more persons in any State or Territory shall conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States.

92.     The Office of the President of the United States is such an office of the United States. Defendant DNC, acting through its officers, agents, employees, and other independent contractors and representatives, of more than two (2) persons, collaborated, conspired, and agreed amongst themselves to hamper, impede and sabotage Plaintiffs' campaign for the Office of the President of the United States.

93.     One such instance in which the use of force was threatened was in the State of South Carolina, on January 17, 2016.

94.     On that date, Candidate Wilson was invited to participate in a campaign event with other Presidential candidates.

95.     Candidate Wilson was at the time a candidate on the ballot in the State of South Carolina, having paid a ballot access fee of $20,000.00, that no other candidate was required to pay.

96.     When he arrived at the campaign event, he was denied access to the stage upon which other Presidential candidates were seated.

97.     The individuals who denied him access appeared to him to be Secret Service Agents assigned to Hillary Clinton.

98.     The event was co-sponsored by the DNC and the South Carolina Democratic Committee and was attended by the DNC Chairperson, Ms. Wasserman-Schultz.

99.     Even though Candidate Wilson's representatives sought intervention from the South Carolina Democratic Committee officials and DNC officials, neither intervened to allow Candidate Wilson to participate as a candidate on stage with the other candidates thereby ratifying the threats of force levelled at Candidate Wilson. (See attached Declarations of Jonathan Metcalf and Willie Wilson, attached as Exhibits "L" and "M").

100.     Given the DNC's express and implied duty of impartiality and neutrality, as well as its anti-discrimination policy, it had a duty to intervene to ensure that candidates such as Plaintiff Wilson were treated impartially and fairly in its sponsored campaign events.

101.     The DNC's acquiescence in the actions of candidate Hillary Clinton's security detail were deliberate, intentional and designed to harm Candidate Wilson's campaign.

102.     The DNC's actions, as described herein, have caused the Plaintiffs' significant financial losses, including funds that were expended in Candidate Wilson's presidential campaign.

103.   Defendant DNC's actions impeded, delayed, precluded and interfered with its contractual relationship with Plaintiffs.

104.     Plaintiffs are thus entitled to compensatory damages from the DNC in an amount to be proven at trial, but not less than all amounts expended by the Plaintiffs in pursuit of the Office of the President of the United States.

*AD DAMNUM*

**WHEREFORE,** Plaintiffs respectfully urge this Court to find against Defendant DNC, based upon the above referenced common law claims and/or its violations of Plaintiffs' civil and constitutional rights under, 42 U.S.C. §§1981 and 1985, and to award the following damages:

    a.  Compensatory damages in an amount in excess of $2,000,000.00, the exact amount to be determined at trial, but in no event less than all amounts expended by the Plaintiffs in pursuit of the Office of the President of the United States;

    b.  Punitive damages related to Defendant's violation of Plaintiff's civil and constitutional rights in an exact amount to be determined at trial, but in no event less than 5,000,000.00;

    c.  Attorney's fees and costs pursuant to 42 USC §1988;

    d.  Appropriate equitable relief; and,

    e.  Such further relief as this honorable Court deems just and necessary.

## **JURY DEMANDED**

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Respectfully submitted,

**WAYNE B. KENDALL, P.C.**

s/Wayne B. Kendall
Georgia Bar No.: 414076
Wayne B. Kendall, P.C.
155 Bradford Square. Suite B

Fayetteville, GA  30215
Telephone: (770) 778-8810
Facsimile: (770) 716-2439
Email: wbkendall2@yahoo.com

**TEMPLE LAW OFFICES**

s/Donald M. Temple
DC Bar No.  [#408749]
1101 15th Street, N.W., Suite 910
Washington, D.C. 20005
Telephone: (202) 628-1101
Facsimile: (202) 628-1149
Email: dtemplelaw@gmail.com

Attorneys for Plaintiffs

**DATED:** December 8, 2017

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via

the Court's electronic notification system to the following parties.

> Bruce V. Spiva,
> Elisabeth C. Frost,
> Alexander G. Tischenko (admitted *pro had vice*)
> 700 Thirteenth Street, N.W., Suite 600
> Washington, D.C.  20005-3960
> Telephone:  202.654.6200
> Facsimile:  202.654.6211

Dated: December 8, 2017

**WAYNE B. KENDALL, P.C.**

/s/Wayne B. Kendall
Wayne B. Kendall, P.C.
155   Bradford   Square,   Suite   B
Fayetteville, GA 30215
Phone: (770) 778-8810
Email: wbkendall2@yahoo.com