**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WILLIE LEE WILSON** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**DNC SERVICES CORPORATION**,<br><br>Defendant. | Case No. 1:17-cv-00730 (TNM) |

**MEMORANDUM OPINION**

Plaintiff Willie Lee Wilson is an African-American citizen who ran in the 2016 Democratic presidential primary. Mr. Wilson and his campaign committee allege in their Amended Complaint that the DNC Services Corporation, doing business as the Democratic National Committee, or DNC, discriminated against Mr. Wilson and thwarted his campaign efforts because of his race. They seek $2 million in compensatory damages and $5 million in punitive damages under four theories of recovery: breach of contract, promissory estoppel, race discrimination in violation of the right under 42 U.S.C. § 1981 to make and enforce contracts, and conspiracy to violate civil rights under 42 U.S.C. § 1985. Plaintiffs' breach of contract and promissory estoppel theories fail because the Amended Complaint does not adequately allege the existence of a contract that the DNC breached or of an unkept promise by the DNC on which the Plaintiffs reasonably relied. But it would be premature to dismiss Plaintiffs' Section 1981 and Section 1985 claims at this early stage in the proceedings. Thus, the DNC's Motion to Dismiss will be granted in part and denied in part.

## I. BACKGROUND

Mr. Wilson describes himself as the son of a sharecropper, an entrepreneur with a rags-to-riches story, a philanthropist, and a religious motivational speaker. Am. Compl. 1, ¶¶ 5, 8. Mr. Wilson ran in the 2016 Democratic presidential primary, formally registering his campaign committee with the Federal Election Commission in May 2015 and qualifying to be on the ballot in nine or ten states. *Id.* 2, ¶¶ 7, 10, 52. Mr. Wilson describes his message as one of "governmental accountability, equal justice, business development and social and economic opportunity." *Id.* ¶ 6. He believes this message appeals to working and middle-class Americans and that his candidacy had the potential to attract "prospective African-American and other voters." *Id.* ¶¶ 7-8. According to Mr. Wilson, DNC leadership intended to "ensure" that Hillary Clinton won the Party's nomination and "viewed Candidate Wilson's race and the potential racial implications of his candidacy as a threat." *Id.* ¶¶ 7, 9.

At the end of May 2015, Mr. Wilson advised the DNC through counsel that he intended to seek the Party's nomination. *Id.* Exs. B, D 3.[1] On July 6, 2015, counsel contacted the DNC a second time, asking for confirmation that the DNC "recognized" Mr. Wilson and seeking information about the nomination process, the DNC debate schedule, and any other resources the DNC could offer. *Id.* Ex. C. In response, the DNC introduced counsel to its Party Affairs Director, who sent counsel several documents about the nomination and delegate selection process. *Id.* Ex. D 1. It also explained that Mr. Wilson's campaign would need to meet certain threshold requirements to participate in the Democratic primary debates or in a meeting the DNC

---

[1] Mr. Wilson's Amended Complaint alleges that counsel "sought campaign support and general information on the Democratic Party's nominating process." *Id.* ¶ 32. But the actual correspondence attached to the Amended Complaint provided the DNC notice of Mr. Wilson's candidacy, campaign committee name, campaign website, and campaign contact information without requesting any support or information from the DNC. *Id.* Exs. B, D 3.

would hold that August. *Id.* Ex. D 2. Finally, the DNC offered to answer any further questions and introduced counsel to its National Political Director as a contact who could answer state-specific questions and who could make introductions to state Party leadership if the campaign needed them. *Id.* According to Mr. Wilson, this correspondence constituted a promise "to provide assistance to Candidate Wilson in the form of introductions to State Party officials, logistical resources, and general political assistance." *Id.* ¶ 37.

Mr. Wilson alleges that, despite this promise, the DNC "acting through its officers, agents, employees, and other independent contractors and representatives . . . collaborated, conspired, and agreed amongst themselves to hamper, impede and sabotage [his] campaign." *Id.* ¶ 92. According to Mr. Wilson, the DNC resisted his campaign efforts by barring him from DNC-sponsored events and encouraging state Party officials to bar him from events that they organized. *Id.* ¶¶ 41-43. In particular, the DNC denied Mr. Wilson access to its August meeting. *Id.* ¶¶ 45-48, 56-58. And the DNC acquiesced in a decision by Secret Service agents[2] detailed to Mrs. Clinton's security team to keep Mr. Wilson off the stage at multi-candidate campaign event co-sponsored by the DNC and the South Carolina Democratic Committee, even though Mr. Wilson had been invited to appear on stage. ¶¶ 93-104. Mr. Wilson also alleges that the DNC inhibited his campaign by refusing to "sanction" it, which prevented him from gaining ballot access in many of the 19 states where he sought to register. *Id.* ¶¶ 50-51, 55.

Finally, Mr. Wilson alleges that the DNC "selectively entered licensing agreements with presidential campaign committees" to provide candidates access to a nationwide database of

---

[2] The Amended Complaint states the individuals "appeared to [Mr. Wilson] to be Secret Service Agents." *Id.* ¶ 97. The parties seem to assume that they were in fact federal agents. *See, e.g.*, Memo. ISO Mot. Dismiss 34; Opp. to Mot. Dismiss 20; Reply ISO Mot. Dismiss 18. For purposes of this opinion, so do I.

Democratic voter data. *Id.* ¶ 59. According to Mr. Wilson, the DNC made this vital fundraising and voter identification resource available to white candidates, although Bernie Sanders' campaign had to sue to enforce its licensing agreement. *Id.* ¶¶ 60-61, 64. But the DNC did not offer Mr. Wilson the same opportunity to license its voter data. *Id.* ¶ 62; *see also* ¶ 38. Mr. Wilson alleges that, because the DNC failed to give him the same licensing opportunity that it offered to similarly situated white candidates, only white candidates enjoyed the benefit of the DNC's voter data. *Id.* ¶¶ 63, 66.

The Democratic Party chose Hillary Clinton as its nominee for President in July, 2016. In April, 2017, Mr. Wilson and his campaign committee sued the DNC. The DNC moved to dismiss the Complaint. While that motion was pending, Plaintiffs filed a Motion for Leave to Amend their Complaint, together with a copy of their proposed Amended Complaint. While that motion was pending, Plaintiffs filed a second Motion for Leave to Amend, attaching another proposed Amended Complaint. I granted Plaintiffs' second motion, and the filing of their Amended Complaint mooted the DNC's pending Motion to Dismiss. The DNC filed a second Motion to Dismiss, which is now ripe.

## II.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires that a complaint raise "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleading facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 545-46. Thus, a court evaluating a motion to dismiss for

4

failure to state a claim does not accept the truth of legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. That said, it construes the complaint in the light most favorable to the plaintiff and accepts as true all reasonable inferences drawn from well-pled factual allegations. *See In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). Consideration is limited to "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. D.C. Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017).

## III.   ANALYSIS

The law contains many measures to combat racial discrimination and to protect equality. Plaintiffs invoke several of them in support of their claims against the DNC, and I evaluate these issues with care. The law also protects "the freedom to join together in furtherance of common political beliefs." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). And this right "necessarily presupposes the freedom to identify the people who constitute that association, and to limit the association to those people only." *Id.* *Jones* held that the right to avoid unwanted association is particularly important when selecting a party's nominee. *Id.* at 575. This is because the nomination process "often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id.* This First Amendment right is also the law of the land, and I apply it with equal care.

### A. Plaintiffs Fail to Allege Facts Showing the Formation of an Implied Contract

Plaintiffs allege that the DNC entered an implied contract with Mr. Wilson and that this contract contained an implicit covenant of good faith and fair dealing that the DNC breached.

5

Am. Compl. ¶¶ 12, 70.[3]  "For an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Georgetown Entm't Corp. v. Dist. of Columbia*, 496 A.2d 587, 590 (D.C. 1985).  An implied contract is no exception, as "it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993).  To recover damages on an implied-in-fact contract, a plaintiff must establish:

> (1) valuable services being rendered; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to charged that the [person rendering the services] expected to be paid by him or her.

*Id.*

The DNC's Motion to Dismiss argues that Plaintiffs cannot recover on an implied-in-fact contract because they have not shown that they rendered valuable services to the DNC or that they did so under circumstances that reasonably notified the DNC that they expected payment. Memo. ISO Mot. Dismiss 21-23.  As the DNC points out, Plaintiffs have alleged that the DNC saw their efforts as a threat, not that the Plaintiffs offered the DNC valuable services.  *Id.* at 22. Nor does the Complaint allege any facts suggesting that the DNC should have known that the

---

[3]  The Amended Complaint also alleges that the DNC violated an implied covenant of neutrality. *Id.* ¶ 68-69.  But the DNC's Motion to Dismiss argues that the District of Columbia's contract law does not recognize implied covenants of neutrality.  Memo. ISO Mot. Dismiss 25-26. Plaintiffs' Opposition concedes this point by failing to address it.  *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").  Even if Plaintiffs had not conceded the point, the argument based on the implied covenant of neutrality would fail for the same reasons as the argument based on the implied covenant of good faith and fair dealing.

6

Plaintiffs expected payment by the DNC.  Plaintiffs' Opposition does not argue otherwise. Instead, it argues that the *DNC* promised valuable services to the *Plaintiffs*, that the Plaintiffs reasonably relied on the DNC's promises, that the DNC provided some but not all of the services it promised, and that the DNC knew it broke some of its promises despite inducing Plaintiffs to rely on those promises.  Opp. to Mot. Dismiss 15.  This is not responsive to the DNC's observation that the Plaintiffs did not offer valuable services to the DNC under circumstances that put the DNC on notice that they expected payment.  By failing to respond to the DNC's argument, the Plaintiffs have conceded that they have not satisfied the elements required to recover damages on an implied-in-fact contract.  *See Hopkins*, 284 F. Supp. 2d 25.[4]

Even if Plaintiffs had established that they provided valuable services to the DNC and that the DNC reasonably should have known they expected payment, their breach of contract claim would fail because they have not alleged facts showing "(1) agreement as to all material terms; and (2) intention of the parties to be bound." *Georgetown Entm't Corp.*, 496 A.2d at 590. The Plaintiffs allege that by registering with the Federal Election Commission they "accepted the DNC's terms and conditions for running as a democratic candidate for President."  Am. Compl. ¶ 11.  They also allege that, as consideration for accepting these terms and conditions, "the DNC promised to provide Candidate Wilson with certain resources, logistical guidance and information in order to facilitate having his name placed on state ballots." *Id.* ¶ 12.

A plaintiff cannot show that the parties to an alleged contract agreed on all material terms if any of the material terms are so vague, indefinite, or uncertain that it is impossible to determine what the parties intended.  *Rosenthal v. Nat'l Produce Co., Inc.*, 573 A.2d 365, 369-70

---

[4] If Plaintiffs intend their list of irrelevant factual allegations, *see* Opp. to Mot. Dismiss 15, as an alternative set of elements for recovery on an implied-in-fact contract, their argument fails because they have not supported it with citation to authority.

7

(D.C. 1990); *see also Dyer v. Bilaal*, 983 A.2d 349 (D.C. 2009) ("A contract's material terms (such as subject matter, price, payment terms, and duration) must be sufficiently definite so that each party can be reasonably certain about what it is promising to do or how it is to perform."). Plaintiffs' conclusory allegations about their obligation to follow "the DNC's terms and conditions" and the DNC's obligation to "provide Candidate Wilson with certain resources, logistical guidance and information" do not make clear what each party promised to do. *See* Am. Compl. ¶¶ 11-12.[5] So Plaintiffs have failed to allege facts showing agreement on the material terms of the alleged contract.

Plaintiffs have also failed to allege facts showing that the parties manifested their intent to be bound by the alleged contract. Plaintiffs have identified no conduct by the DNC that would objectively manifest its intent to be bound.[6] And the only conduct of their own to which the Plaintiffs point is their registration with the Federal Election Commission, which they believe showed their acceptance of the DNC's rules for primary candidates. *Id.* ¶ 11. Registering with the Federal Election Commission—a nonpartisan government agency—does not establish a contract with a political party. To hold otherwise would be to ignore the First Amendment's

---

[5] Plaintiffs also claim that the DNC sent them a letter in which they promised "to provide assistance to Candidate Wilson in the form of introductions to State Party officials, logistical resources, and general political assistance." Am. Compl. ¶ 37. But the alleged promise to provide logistical resources and general political assistance is too vague to be enforceable, and the record shows that the alleged promise to make introductions was in fact an introduction to a DNC official who could make introductions upon request. *See id.* Ex. D 2. I note that Plaintiff does not allege that they requested any introductions or that any such requests were denied.

[6] Although they claim that the DNC sent them a letter promising information and support, they do not contest the DNC's argument that the promise was gratuitous and created no binding obligations. *See* Memo. ISO Mot. Dismiss 20; Reply ISO Mot. Dismiss 7. They also claim that the DNC's letter promised to introduce them to state Party officials, but the actual correspondence submitted by the Plaintiffs shows that this is not the case. *Compare* Am. Compl. ¶ 37 (asserting the DNC promised to make introductions) *with id.* Ex. D 2 (identifying a DNC official who "can . . . make introductions if you need").

special protection for "the process by which a political party select[s] a standard bearer who best represents the party's ideologies and preferences." *Jones*, 530 U.S. at 575.

In sum, the Plaintiffs' breach of contract claim fails for three alternative reasons. First, Plaintiffs correctly concede that they have not satisfied the requirements for recovering damages on an implied-in-fact contract. Second, Plaintiffs have not alleged facts establishing agreement on the material terms of the alleged contract. Third, Plaintiffs have not alleged facts establishing the parties' intent to be bound by the alleged contract. For all these reasons, the Plaintiffs' breach of contract claim will be dismissed as the DNC requests.

### B. Plaintiffs Fail to Allege Facts Showing Reasonable Reliance on a Promise

"To survive a Rule 12(b)(6) motion for failure to state a claim of promissory estoppel, a plaintiff must show (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment." *See Greggs v. Autism Speaks, Inc.*, 987 F. Supp. 2d 51, 55 (D.D.C. 2014). Although a promise need not be as specific for purposes of promissory estoppel as it would be for a contract, a "promise must be definite, as reliance on an indefinite promise is not reasonable." *Headfirst Baseball LLC v. Elwood*, 168 F. Supp. 3d 236, 248 (D.D.C. 2016).

The DNC argues that Plaintiffs have identified no definite promises that the DNC made and on which the Plaintiffs could have reasonably relied. Memo. ISO Mot. Dismiss 27-29. The Plaintiffs' Opposition does not address definiteness and so concedes the point. *See Hopkins*, 284 F. Supp. 2d at 25. Thus, the promissory estoppel claim must also be dismissed.

### C. Plaintiffs Have Alleged Facts Showing a § 1981 Violation

Section 1981 combats racial discrimination by protecting the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race. 42 U.S.C. § 1981(a). "[T]o state a claim for racial discrimination under Section 1981, a

9

plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *See Mazloum v. Dist. of Columbia Metro. Police Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C. 2007). To plead intentional discrimination, a plaintiff cannot merely invoke his race, but must allege some facts to show that race was the reason for the defendant's action. *See Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990). For example, a plaintiff may allege facts showing that he was treated less favorably than another similarly situated person of a different race. *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014).

Plaintiffs have satisfied the first element of a Section 1981 claim by alleging that Mr. Wilson is African-American. *See* Am. Compl. ¶ 3.[7] But the DNC argues that Plaintiffs have not alleged facts showing race discrimination or showing that any discrimination implicated Section 1981's protection of the right to enforce contracts. Memo. ISO Mot. Dismiss 29-32. The DNC argues that Plaintiffs cannot show the DNC denied them the ability to enforce an implied contract without showing that the contract existed. *Id.* at 29-30. And I have already determined that Plaintiffs have not established the existence of an implied-in-fact contract.

But Section 1981 protects the right to make contracts as well as the right to enforce them. And Plaintiffs allege that the DNC did not provide Mr. Wilson the opportunity to enter a contract for access to the DNC's voter data. Am. Compl. ¶ 62. Plaintiffs allege that Mr. Wilson qualified for the opportunity to enter such a contract, having registered with the Federal Election

---

[7] For purposes of this motion, I assume without deciding that differential treatment of a campaign committee based on the race of the candidate whom the committee supports violates Section 1981. *Cf. Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017) ("[D]iscrimination against a business based on the race of its owner violates section 1981."). The DNC has not disputed this point, nor am I aware of any reason to doubt it.

Commission and contacted the DNC. Am. Compl. ¶¶ 86-87. It is reasonable to infer from their pleadings that the DNC provided this contract opportunity to Bernie Sanders—a white candidate who was similarly situated in that he also registered with the Federal Election Commission and contacted the DNC. *Id.* ¶ 64 (noting that the Sanders campaign sued the DNC to enforce a licensing agreement). Thus, Plaintiffs have sufficiently alleged that the DNC discriminated against them in their ability to make contracts because of race. *See Brown*, 774 F.3d at 1023.

Plaintiffs certainly have not proven that the DNC acted from racial animus. In fact, their allegation that the DNC did not want voters exposed to "the substance of [Mr. Wilson's] values and platform" suggests a possible alternative reason for the DNC's unfavorable treatment of his campaign. *See* Am. Compl. ¶ 66. And query whether the DNC would actually be willing to share its sensitive voter data with just any candidate—regardless of race—who meets the minimum standards for candidacy. But at this stage in the litigation I must evaluate the Plaintiffs' allegations, not their proof, and I must make all reasonable inferences in their favor. *See In re United Mine Workers*, 854 F. Supp. at 915. Dismissal of Plaintiffs' Section 1981 claim about the voter data licensing agreement would therefore be premature.

**D. Plaintiffs Have Alleged Facts Showing a § 1985 Violation**

The Ku Klux Klan Act of 1871 creates a cause of action with four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986). The Act defines four ways in which a conspiracy could deprive a plaintiff of the equal protection of the law. 42 U.S.C. § 1985(3). Only one is relevant here: A conspiracy falls within the scope of Section 1985 if it seeks "to prevent by force, intimidation, or threat, any citizen who is lawfully

11

entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President . . . ." 42 U.S.C. § 1985(3) cl. 3.[8]

Plaintiffs allege in general terms that the DNC conspired against Mr. Wilson's campaign, and then describe a specific incident in South Carolina that they believe provides an example of the DNC's misconduct. Am. Compl. ¶¶ 92-104. The general allegation of conspiracy is conclusory and does not preserve any claims based on incidents beyond the scope of the Amended Complaint. *See Twombly*, 550 U.S. at 555. But the Plaintiffs' allegations about the incident in South Carolina satisfy the requirements for stating a Section 1985 claim.

At the core of Plaintiffs' claim is the allegation that Secret Service agents on Mrs. Clinton's security detail used the threat of force to keep Mr. Wilson off stage at a multi-candidate campaign event in South Carolina, even though he had been invited to appear on stage. Am. Compl. ¶¶ 93, 96-97. The event was co-sponsored by the DNC and the South Carolina Democratic Committee, and Mr. Wilson's representatives tried to get officials from both groups to intervene on his behalf. *Id.* ¶¶ 98-99. But the DNC acquiesced in the agents' actions. *Id.* ¶ 101.

The DNC argues that its failure to intervene on Mr. Wilson's behalf is not evidence of conspiracy and does not make it responsible for the Secret Service's alleged threats and intimidation, pointing out that it is a felony to interfere with Secret Service agents in the performance of their duties. Memo. ISO Mot. Dismiss 34, 37. But it is unlikely that the Secret Service acted independently of the campaign event's sponsors in determining who should have

---

[8] Plaintiffs have not stated which clause supports their claim, but this is the only provision that plausibly supports a claim based on their factual allegations.

access to the stage. And if DNC officials had not wished to keep Mr. Wilson off the stage, they likely could have explained to the Secret Service—or Mrs. Clinton—that Mr. Wilson was an invited candidate without committing a felony.

Drawing all reasonable inferences in Plaintiffs' favor, as I must at this stage in the litigation, I find that they have adequate alleged facts showing a conspiracy between the DNC and the Secret Service to use intimidation and threats to prevent Mr. Wilson from advocating for his presidential campaign in a legal manner. *See In re United Mine Workers*, 854 F. Supp. at 915. This makes the Secret Service's conduct attributable to the DNC. *See* 42 U.S.C. § 1985(3) (creating a cause of action against "any one or more of the conspirators" based on any act in furtherance of the conspiracy by co-conspirators). Thus, I cannot accept the DNC's argument that I should dismiss the Section 1985 claim because there was no conspiracy and the DNC lacks responsibility for the conduct of the Secret Service. The evidence may prove that there was in fact no conspiracy. Or it may prove that the Plaintiffs cannot satisfy one of the other elements of a Section 1985 claim.[9] But the DNC has not yet carried its burden of proving that the Plaintiffs have failed to state a claim under Section 1985 arising from the incident in South Carolina.

## IV. CONCLUSION

For the reasons stated above, the DNC's Motion to Dismiss will be granted in part and denied in part. Mr. Wilson may proceed with his Section 1981 claim based on the DNC's failure to offer him the opportunity to license its voter data and with his Section 1985 claim based on the

---

[9] For the time being, it is reasonable to infer Mr. Wilson's likely right to vote from his qualification to run for President and his longtime support of the Democratic Party. *See* Am. Compl. 2. And Plaintiffs have alleged that the conspiracy not only deprived Mr. Wilson of the right to advocate lawfully for his campaign but also caused them significant financial loss. *Id.* ¶ 102.

13

incident in South Carolina. Mr. Wilson's other claims will be dismissed. A separate order will issue.

Dated: June 22, 2018

*/s/ Trevor N. McFadden*
TREVOR N. MCFADDEN
United States District Judge