## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Willie Lee Wilson and<br>Willie Wilson 2016,<br><br>        Plaintiffs,<br><br>  v.<br><br>DNC Services Corporation d/b/a<br>Democratic National Committee,<br><br>        Defendant. | Civil Action No. 1:17-cv-00730-TNM |

## DEFENDANT DEMOCRATIC NATIONAL COMMITTEE'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 1

II.    PROCEDURAL BACKGROUND .......................................................................... 2

III.   FACTUAL BACKGROUND .................................................................................. 3

   A.  The DNC Voter File........................................................................................... 3

   B.  The January 16, 2016 James Clyburn World Famous Fish Fry............................ 7

IV.   Legal standard ...................................................................................................... 12

V.    ARGUMENT........................................................................................................ 13

   A.  Summary Judgment Should Be Granted Against Plaintiffs' Section 1981 Claim............. 13

      1.  There is No Genuine Dispute that Plaintiffs Never Sought to Contract with the DNC for
          Use of its Voter File........................................................................... 14

      2.  Dr. Wilson Is Not Similarly Situated to the Candidates Offered the Opportunity to
          Contract for the Voter File ................................................................ 17

   B.  Summary Judgment Should Be Granted Against Plaintiffs' Section 1985 Claim............. 21

      1.  Plaintiffs Have Not Demonstrated that the DNC Entered into an Agreement with the
          Secret Service or Any Other Person to Prevent Dr. Wilson, through Force, Intimidation,
          or Threat, From Advocating for His Candidacy at the Clyburn Fish Fry...................... 23

      2.  Plaintiffs Have Not Even Demonstrated that Dr. Wilson Should Have Been Granted
          Access to the Restricted Area at the Clyburn Fish Fry or that Dr. Wilson Should Have
          Been Able to Speak at the Clyburn Fish Fry ............................................... 26

      3.  Plaintiffs Have Not Demonstrated that the Secret Service's Actions Were Illegal ....... 29

VI.   CONCLUSION........................................................................................................ 31

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).................................................................................12

*Arkansas Educ. Television Comm'n v. Forbes,*
    523 U.S. 666 (1998).................................................................................19

*Ayissi-Etoh v. Fannie Mae,*
    712 F.3d 572 (D.C. Cir. 2013) ...............................................................13

*Barr v. Clinton,*
    370 F.3d 1196 (D.C. Cir. 2004) .............................................................29

*Big Apple Tire, Inc. v. Telesector Res. Grp., Inc.,*
    476 F. Supp. 2d 314 (S.D.N.Y. 2007).....................................................20

*Black Educ. Network, Inc. v. AT & T Broadband, LLC,*
    154 F. App'x 33 (10th Cir. 2005) ...........................................................19

* *Brady v. Office of Sergeant at Arms,*
    520 F.3d 490 (D.C. Cir. 2008) .................................................13, 14, 15

*Burton v. D.C.,*
    153 F. Supp. 3d 13 (D.D.C. 2015) .........................................................17

*Cal. Democratic Party v. Jones,*
    530 U.S. 567 (2000)................................................................................19

* *Coward v. ADT Sec. Sys., Inc.,*
    140 F.3d 271 (D.C. Cir. 1998) ...............................................................20

* *Denny v. Elizabeth Arden Salons, Inc.,*
    456 F.3d 427 (4th Cir. 2006) ....................................................14, 15, 17

*Fair v. Prime Sec. Distributors, Inc.,*
    134 F.3d 371 (6th Cir. 1997) .................................................................15

*Freedom Watch, Inc. v. Google, Inc.,*
    No. 1:18-CV-02030 (TNM), 2019 WL 1201549 (D.D.C. Mar. 14, 2019)............................23

* *Graves v. United States,*
    961 F. Supp. 314 (D.D.C. 1997) ......................................................22, 23

*Green v. Dillard's, Inc.,*
    483 F.3d 533 (8th Cir. 2007) .................................................................14

*Gregory v. Dillard's, Inc.,*
    565 F.3d 464 (8th Cir. 2009) .................................................................14

**TABLE OF AUTHORITIES**

CASES                                                        PAGE

*Grimes v. D.C.*,
794 F.3d 83 (D.C. Cir. 2015) ...............................................................................12

*Hampton v. Dillard Dep't Stores, Inc.*,
247 F.3d 1091 (10th Cir. 2001) ...........................................................................14

*Huthnance v. D.C.*,
255 F.R.D. 297 (D.D.C. 2008) .............................................................................15

*Jackson v. Tyler's Dad's Place, Inc.*,
850 F. Supp. 53 (D.D.C. 1994) ............................................................................14

*Johnson v. Comm'n on Presidential Debates*,
202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) ...........27

* *Knowlton v. United States*,
111 F. Supp. 2d 1 (D.D.C. 1999), *aff'd sub nom. Knowlton v. Alouri*, No.
96CV02467, 2000 WL 1093323 (D.C. Cir. June 27, 2000) ..................................22

*Kurd v. Republic of Turkey*,
No. CV 18-1117 (CKK), 2019 WL 1243731 (D.D.C. Mar. 18, 2019)..................23

*LaRouche v. Fowler*,
152 F.3d 974 (D.C. Cir. 1998) .............................................................................19

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub.
Interest Legal Found*, No. 1:18-CV-00423, 2018 WL 3848404, at *1 (E.D.
Va. Aug. 13, 2018)................................................................................................26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .............................................................................................12

*McManus v. D.C.*,
530 F. Supp. 2d 46 (D.D.C. 2007) .......................................................................23

*Montgomery v. Chao*,
546 F.3d 703 (D.C. Cir. 2008) .............................................................................12

* *Morris v. Carter Goble Lee, Inc.*,
113 F. Supp. 3d 289 (D.D.C. 2015) ......................................................................20

*Morris v. Office Max, Inc.*,
89 F.3d 411 (7th Cir. 1996) ..................................................................................14

*Nanko Shipping, USA v. Alcoa, Inc.*,
850 F.3d 461 (D.C. Cir. 2017) .............................................................................13

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE

\* *Newman v. Borders, Inc.*,
    530 F. Supp. 2d 346 (D.D.C. 2008) ..................................................................14

*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*,
    169 F.3d 16 (D.C. Cir. 1999) .........................................................................12

*Pyramid Sec. Ltd. v. IB Resolution, Inc.*,
    924 F.2d 1114 (D.C. Cir. 1991) .....................................................................15

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    548 F.3d 137 (D.C. Cir. 2008) .......................................................................15

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012) ................................................................23, 25

*Sistrunk v. City of Strongsville*,
    99 F.3d 194 (6th Cir. 1996) ...........................................................................27

*Williams v. Staples, Inc.*,
    372 F.3d 662 (4th Cir. 2004) .........................................................................19

STATUTES

18 U.S.C. § 1752(a)(1), (c) ...............................................................................9, 29

18 U.S.C. § 3056(a)(3) .......................................................................................9, 29

18 U.S.C. § 3056(c), (d) .........................................................................................29

42 U.S.C. § 1981 ............................................................................................. passim

42 U.S.C. § 1985 ............................................................................................. passim

Defendant DNC Services Corporation (the "DNC") respectfully submits this motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") on the remaining claims (Count III (42 U.S.C. § 1981) and Count IV (42 U.S.C. § 1985)) asserted by Dr. Willie Lee Wilson and Willie Lee Wilson 2016's presidential campaign (collectively, "Plaintiffs").

## I.      INTRODUCTION

The DNC is entitled to summary judgment on both of Plaintiffs' remaining claims.

There is no evidence to support Plaintiffs' Section 1981 claim that the DNC discriminated on the basis of race by not entering a contract to license the DNC's Voter File to Dr. Wilson's campaign. Of the more than 200 declared candidates for the 2016 Democratic nomination for President, the DNC licensed its Voter File only to the campaigns of the two frontrunners: Secretary Hillary Clinton and Senator Bernie Sanders. Neither of those candidates was remotely similarly situated to Dr. Wilson, who had no measurable support in any poll and whose campaign raised less than $40,000 from fewer than 40 donors. The DNC's Voter File is a highly proprietary resource that the DNC does not make available to all comers, and Dr. Wilson's campaign met none of the criteria the DNC considered when determining whether to license it to a presidential campaign. In any case, there is no evidence the Plaintiffs ever sought to license a national voter file from the DNC or obtain one from any other source. To the contrary, Dr. Wilson himself decided not even to license the South Carolina Democratic Party's voter file.

Nor is there any evidence to support Plaintiffs' Section 1985 claim that the DNC unlawfully conspired to prevent him from speaking at Congressman Jim Clyburn's World Famous Fish Fry. The DNC had no role in planning that event, inviting its speakers, or coordinating its logistics. There is no question that the Secret Service did not allow Dr. Wilson into the restricted area it had established at the Clyburn Fish Fry to fulfill its duty to protect Secretary Clinton during the event. That decision was understandable given that Dr. Wilson was not wearing a lapel pin that the Secret Service had issued to those allowed in the restricted area. But, whatever the reason for the Secret Service's security decisions, there is no evidence that the DNC had any involvement in the Secret Service's protection at that event, let alone that the DNC entered a conspiracy to prevent

Dr. Wilson from speaking. In fact, Plaintiffs cannot even establish that the Wilson campaign had made any effort to confirm with Congressman Clyburn or the staff of his campaign committee that Dr. Wilson wanted to speak at the event or to coordinate logistics and security with them.

The DNC's motion for summary judgment should therefore be granted.

## II.     PROCEDURAL BACKGROUND

Plaintiffs' original complaint asserted common law breach of contract claims (Counts I and II), as well as claims under 42 U.S.C. § 1981, which forbids intentional racial discrimination in the making and enforcement of contracts (Count III), and 42 U.S.C. § 1985, which forbids conspiracies to interfere with civil rights (Count IV). ECF No. 1. The DNC promptly moved to dismiss. Among other arguments, the DNC pointed out that Plaintiffs' civil conspiracy claim was entirely conclusory and failed to allege any facts suggesting that Dr. Wilson was prevented from advocating for his candidacy by force, intimidation, or threat. ECF No. 10-1, at 35. After the DNC moved to dismiss, Plaintiffs made three attempts to amend their pleadings. Order, ECF No. 20. The Court ultimately granted leave to amend. Order, ECF No. 24. Plaintiffs then filed a Second Amended Complaint ("SAC"), ECF No. 25. The SAC added, for the first time in the litigation, factual allegations related to a January 2016 political event in South Carolina at which Plaintiffs complain Dr. Wilson was barred by the Secret Service from taking the stage. ECF No. 25, at 18-19 (¶¶ 93-101).

The DNC again moved to dismiss. ECF No. 26. The Court granted in part and denied in part the DNC's motion to dismiss. Memo. Op., ECF No. 29; Order, ECF No. 30. The motion was granted "as to Counts I and II of the Amended Complaint, alleging breach of implied contract and promissory estoppel . . . ." Order, ECF No. 30, at 1. The Court's Order denied the DNC's motion to dismiss with respect to two specific sets of allegations, finding that each adequately stated a claim. First, the Court did not dismiss the Plaintiffs' 42 U.S.C. § 1981 claim with respect to allegations that the DNC did not contract with Dr. Wilson's campaign to give it access to the DNC's national voter file ("Voter File") because of his race (Count III). Memo. Op., ECF No. 29, at 11. Second, the Court did not dismiss the allegation that the DNC conspired to bar Dr. Wilson

from speaking at a political event in South Carolina at which he complains he was barred by the Secret Service from taking the stage (Count IV). *Id.* at 12. The Court held that all of Plaintiffs' other allegations failed to state a claim under Section 1981 and Section 1985. *Id.* at 11, 12, 14; Order, ECF No. 30 (dismissing "any claims under Counts III and IV other than the two specified above").

The parties engaged in discovery. The Court initially provided Plaintiffs four months to conduct discovery, which the Court expanded to six months at Plaintiffs' request. The DNC produced thousands of pages of requested documents, which include the documents in the DNC's possession relating to Dr. Wilson's candidacy and the South Carolina political event at issue, and responded to twenty-five interrogatories propounded by the Plaintiffs. And despite Plaintiffs' failure to timely notice depositions, they took depositions of two fact witnesses and a corporate representative of the DNC on each of the four topics that they noticed, including one topic over the DNC's First Amendment objection.

This motion seeks summary judgment on Plaintiffs' remaining claims.

### III.    FACTUAL BACKGROUND

#### A.    The DNC Voter File

The DNC is the national party committee for the Democratic Party. SOUF ¶ 77. Part of the DNC's mission is to coordinate strategy to support Democratic candidates throughout the country for local, state, and national office. SOUF ¶ 27. To compete for the Democratic nomination for President, candidates must obtain ballot access in states and earn delegates to the Democratic National Convention by winning votes at state primaries and caucuses. SOUF ¶ 1. Federal law also requires candidates for the Democratic nomination for President to file a statement of candidacy with the Federal Election Commission (FEC). SOUF ¶ 2. More than 200 individuals, including Dr. Wilson, filed with the FEC as candidates for the 2016 Democratic nomination for President. SOUF ¶ 3.

In the 2016 election cycle, the DNC offered certain resources to any bona fide candidate who successfully filed with the Federal Election Commission and made themselves known to the

DNC, including Dr. Wilson. These resources included information on the delegate selection process in each state and territory through the DNC's Office of Party Affairs and Delegate Selection, contacts to each State and Territorial Party through the DNC's Political Department, and a roster of DNC members. SOUF ¶ 9. Understandably, however, the DNC did not offer its full slate of resources to any candidate who filed paperwork with the FEC. For example, the DNC did not invite 200 candidates to participate in the debates and other candidate events it sponsored. Instead, it included only those candidates who polled at a minimum of one percent in three separate national polls, conducted by credible news polling organizations, at least six weeks before the event. SOUF ¶ 14. Nor did the DNC offer the opportunity to license its highly proprietary Voter File to each bona fide 2016 Democratic presidential candidate who successfully filed with the FEC. SOUF ¶ 32. Rather, if a Presidential campaign sought access to the DNC's Voter File, the DNC decided whether to enter into a license agreement for its use based on whether the campaign had a realistic chance of competing in enough states' primary elections and amassing enough delegates to earn the party's nomination for President and to become the party's general election candidate. SOUF ¶ 35. The factors that the DNC considered included a presidential campaign's demonstrated support among Democratic primary voters as measured by public opinion polls and fundraising, including both the amount of funds raised and the number of donors. The DNC also considered whether the campaign had a demonstrated ability and commitment to raise funds for the DNC to support the ongoing creation and maintenance of the DNC Voter File and to employ campaign staff with sufficient experience and training to be responsible stewards of the Party's data. SOUF ¶ 39.

The DNC Voter File is an important, complex, and valuable resource that is central to the DNC's mission to support Democratic candidates throughout the country for local, state, and national office. SOUF ¶ 27. The DNC Voter File is not simply a list of voters that can be downloaded or printed out. Rather, it is a sophisticated electronic database that combines millions of pieces of information about registered voters compiled from public voter registration records, commercial data sources, data collected through campaigns' interactions with voters, and from

proprietary analytical modeling. SOUF ¶ 26. Organizations and campaigns that use the DNC Voter File undergo specialized training and hire information technology staff responsible for setting up, maintaining, and updating the campaign or organization's interface with the database to support its end users. SOUF ¶ 29. Nor is the DNC Voter File a static list. Parties and campaigns that use the DNC Voter File can edit and update information in the database that is shared by other users. SOUF ¶ 30. For this reason, it is critical that all organizations and campaigns that use the DNC Voter File have the experience and training to exercise responsible stewardship of the party's data. SOUF ¶ 30.

The DNC invests substantial resources in the creation and maintenance of its Voter File. The DNC Voter File includes information that is valuable, politically sensitive, and not commercially available from the DNC or other sources. SOUF ¶ 31.

In 2016, the DNC did not license access to the DNC Voter File for Iowa, New Hampshire, South Carolina, and Nevada, the first four states to hold primary contests. SOUF ¶ 32. Instead, the State Democratic Parties of Iowa, New Hampshire, South Carolina, and Nevada entered into licensing agreements with Presidential candidates for use of voter file information for their respective states. SOUF ¶ 32. The DNC's licensing agreements with Secretary Clinton and Senator Sanders for use of the DNC Voter File excluded the first four states to hold primary contests. SOUF ¶¶ 32, 34.

Of the more than 200 Democratic presidential candidates who filed with the FEC for the 2016 election, the DNC only entered into licensing agreements for use of the DNC Voter File with the campaigns of Senator Bernie Sanders and former Secretary of State Hillary Clinton. SOUF ¶¶ 3, 40. Senator Sanders and Secretary Clinton were the consistent frontrunners for the Democratic nomination in 2015 and 2016. Each consistently polled in double digits throughout most of 2015. SOUF ¶¶ 48-49. The Sanders and Clinton campaigns attained ballot access in every primary, which made it possible for them to amass enough delegates to have a chance at earning the party's nomination. SOUF ¶ 51. By the end of 2015, Senator Sanders and Secretary Clinton had each raised tens of millions of dollars from tens of thousands of individual donors. SOUF

¶¶ 57-58. The Sanders and Clinton campaigns entered into licensing agreements with the State Democratic Parties of Iowa, New Hampshire, Nevada, and South Carolina to obtain voter file access for those states. The Clinton and Sanders campaigns both approached the DNC to enter into a licensing agreement for the DNC Voter File.[1]

In sharp contrast to Senator Sanders and Secretary Clinton, Plaintiffs ran a small-scale, largely self-financed presidential campaign in a few states. Dr. Wilson only managed to attain ballot access in nine states, did not obtain ballot access in the critical early primary state of New Hampshire, and earned no delegates in any contest. SOUF ¶¶ 52-53, 55. Most of Dr. Wilson's senior campaign advisors had little to no political experience or expertise. SOUF ¶ 61. Over the course of the campaign, Plaintiffs raised less than $36,000 from fewer than 40 reported donors. SOUF ¶ 60. Nearly all of the campaign's funding was from loans from Dr. Wilson himself. SOUF ¶¶ 59, 60. Moreover, Dr. Wilson never registered any public support in any public polls. SOUF ¶ 50. Indeed, for this reason, Dr. Wilson never even met the DNC's polling-based threshold to participate in DNC-sponsored debates and events, let alone the other, additional standards for the DNC to enter into licensing agreements for its national Voter File. SOUF ¶ 20.

Nor did Plaintiffs have either the infrastructure or the inclination to use any voter file for their campaign. Plaintiffs admit that at the time of their campaign, they were unaware of the existence of the DNC Voter File and have no documents or communications between them and any other person referring to the DNC Voter File. SOUF ¶ 69. Plaintiffs never asked the DNC about access to the DNC Voter File, SOUF ¶ 70, and although they knew that voter files existed, they never tried to purchase access to a voter file from any other source, and intentionally declined to pursue such an opportunity with the South Carolina Democratic Party. SOUF ¶ 74. Moreover, Plaintiffs had no plan in place for what the campaign would do with a voter file, nor any trained staff who could make effective use of a voter file. SOUF ¶¶ 65-66.

---

[1] The DNC did not enter Voter File licenses with the campaigns of Martin O'Malley, Jim Webb, or Lincoln Chaffee, all of whom are white, even though each of those campaigns at least at one point in time met the threshold to participate in a DNC debate. SOUF ¶¶ 41-42.

**B.      The January 16, 2016 James Clyburn World Famous Fish Fry**

On Sunday, January 17, 2016, the DNC sponsored and organized a presidential debate in Charleston, South Carolina. SOUF ¶ 87. During the week leading up to the January 17 presidential debate, various organizations, individuals, and companies held events in and around Charleston catering to South Carolina Democratic primary voters and others involved in national, state, and local politics. SOUF ¶ 88. On January 16, 2016, the South Carolina Democratic Party ("SCDP") sponsored and organized an event in Charleston titled the "First in the South Dinner." SOUF ¶ 89. Also on January 16, 2016, Friends of Jim Clyburn and Congressman James Clyburn sponsored and organized an event in Charleston titled "Jim Clyburn's World Famous Fish Fry" ("the Clyburn Fish Fry"). The South Carolina Democratic Party is a state party committee. SOUF ¶ 90. "Friends of Jim Clyburn" is the principal campaign committee of United States Representative James E. Clyburn, who is a Democrat. SOUF ¶ 79. The DNC, the SCDP, and Friends of Jim Clyburn are all separate legal entities. SOUF ¶ 76. Each has separate bank accounts, separate treasurers, a separate corporate existence with separate governance, and each files its own reports to the Federal Election Commission and/or applicable state agencies. SOUF ¶¶ 76, 80.

Dr. Wilson obtained ballot access in the South Carolina Democratic primary election. SOUF ¶ 54. At some date after the SCDP certified Dr. Wilson to be listed on the ballot, Dr. Wilson's campaign received a letter addressed to "Democratic Candidates for US President certified by the SC Democratic Party" bearing the subject line "Invitation to SCDP First in the South Dinner and Congressman Jim Clyburn's World Famous Fish Fry." The letter was signed by Jaime Harrison, the Chair of the SCDP, Harrison and Congressman Clyburn. SOUF ¶ 110. The letter made no mention of the DNC or any DNC employee. SOUF ¶ 119. The letter was not signed by Congresswoman Debbie Wasserman Schultz, the then-Chair of the DNC, and the DNC had no involvement in sending it. SOUF ¶ 120.

In addition, Dr. Wilson's campaign received and retained the Clyburn Fish Fry event flyer. The event flyer stated that it was "Paid for by Friends of Jim Clyburn" and provided the web address www.clyburnforcongress.com. The flyer made no mention of the DNC or the SCDP.

SOUF ¶ 121. Dr. Wilson's campaign's internal schedule for January 14, 2016 through January 18, 2016, which Mr. Metcalf circulated to Dr. Wilson and other campaign staff on January 14, 2016, described the Clyburn Fish Fry as the "James Clyburn World Famous Fish Fry," not as an event sponsored by the SCDP or the DNC. SOUF ¶ 122. Dr. Wilson's January 14, 2015 internal schedule made no mention of the DNC. SOUF ¶ 123. Neither Dr. Wilson nor anyone from his campaign ever communicated with anyone from the DNC about the Clyburn Fish Fry. SOUF ¶ 193.

Dr. Wilson and the Wilson campaign directly corresponded with Mr. Harrison and other SCDP officials about the logistics of his speech at the SCDP dinner. For example, Plaintiffs directly corresponded with SCDP officials about the list of guests that would be attending the SCDP dinner with Dr. Wilson. SOUF ¶ 137. Dr. Wilson offered to send Mr. Harrison a copy of his speech before the SCDP dinner. SOUF ¶ 137.

In contrast to their interactions with the SCDP, neither Dr. Wilson nor anyone from his campaign communicated with Congressman Clyburn or Friends of Jim Clyburn about the Clyburn Fish Fry. Dr. Wilson and his campaign are unaware of any communication between the Wilson campaign and the organizers of the Clyburn Fish Fry other than the letter signed by Congressman Clyburn. SOUF ¶¶ 154-56. As a result, Dr. Wilson and his campaign had no information about with whom he was supposed to check in when he arrived at the Clyburn Fish Fry, or any information about security at the Clyburn Fish Fry, or any information about what he would need in order to be admitted into a restricted area controlled by the Secret Service at the event. SOUF ¶ 157.

The SCDP First in the South Dinner was held in an interior ballroom of the Charleston Marriott hotel. SOUF ¶ 129. The SCDP Dinner was a fundraiser for the SCDP, and attendance was limited to ticketed guests. SOUF ¶ 130. The SCDP invited elected officials and candidates to speak at the dinner, including Dr. Wilson, Secretary Clinton, Senator Sanders, and Governor O'Malley. SOUF ¶ 131. Some DNC employees attended the First in the South Dinner as guests, but the DNC did not sponsor, organize, or have any control over the First in the South Dinner.

SOUF ¶ 133. The SCDP invited Congresswoman Wasserman Schultz, the Chair of the DNC, to speak at the dinner. SOUF ¶ 132.

Because Secretary Clinton would attend the First in the South Dinner, the Secret Service was involved in the logistics for the event. Federal law authorizes the United States Secret Service to protect spouses of former Presidents, including Secretary Clinton, for their lifetimes. *See* 18 U.S.C. § 3056(a)(3). Federal law also prohibits persons from knowingly entering or remaining without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. 18 U.S.C. § 1752(a)(1), (c). Secret Service officers assigned to Secretary Clinton's protective detail were present at the SCDP Dinner and established a restricted area around Secretary Clinton's dinner table, which Dr. Wilson never attempted to enter. SOUF ¶ 140. Dr. Wilson gave a speech to SCDP event attendees, and no one (including the Secret Service agents assigned to Secretary Clinton's protective detail) tried to prevent Dr. Wilson from taking the stage. SOUF ¶ 142.

The Clyburn Fish Fry took place after the SCDP First in the South Dinner. The event was located inside the Charleston Visitor Center parking garage, about a ten-minute drive from the Charleston Marriott. The Charleston Visitor Center parking garage was partially open-air, and there were no doors or other physical structure through which access to the Clyburn Fish Fry event stage was limited. SOUF ¶ 144. The Clyburn Fish Fry was open to the public, and no ticket was required to attend. SOUF ¶ 146. Friends of Jim Clyburn and Congressman Clyburn determined which elected officials and candidates to invite to speak at the Clyburn Fish Fry. SOUF ¶ 148. Some DNC employees attended the Clyburn Fish Fry as guests, but the DNC had no role in sponsoring, paying for, or organizing the Clyburn Fish Fry. The DNC did not have control over who would be invited or permitted to speak at the Clyburn Fish Fry. SOUF ¶ 151. Congresswoman Wasserman Schultz was also invited by Friends of Jim Clyburn and Congressman Clyburn to speak at the Clyburn Fish Fry. SOUF ¶ 149.

Because Secretary Clinton would speak at the Clyburn Fish Fry, the Secret Service was involved in the logistics for that event as well. SOUF ¶ 152. The DNC had no involvement in these security plans or any other logistics for the Clyburn Fish Fry. SOUF ¶ 153.

At the Clyburn Fish Fry, the Secret Service established a restricted area in the area behind the event stage, and it limited access to the restricted area behind the stage to authorized persons. SOUF ¶ 158. The Secret Service issued lapel pins to persons who were authorized to access the restricted area and to persons who were authorized to admit other persons into the restricted area. SOUF ¶ 159.

For example, Mr. Harrison, the Chair of the SCDP, arrived at the Clyburn Fish Fry and attempted to access the restricted area behind the stage. SOUF ¶ 160. Mr. Harrison identified himself to the Secret Service agents by name and title. SOUF ¶ 162. But Mr. Harrison had not been issued a Secret Service lapel pin, and the Secret Service agents initially refused to allow Mr. Harrison access to the restricted area, and he was not admitted until a staff member of Friends of Jim Clyburn, who was wearing a lapel pin, intervened. SOUF ¶¶ 161-63.

After the First in the South Dinner, Dr. Wilson was driven to the Clyburn Fish Fry. When he arrived at the Clyburn Fish Fry, he and other members of his campaign got out of the car near the front of the building and proceeded on foot around the side of the building, towards the back of the building, behind the event stage. SOUF ¶ 165. When Dr. Wilson arrived at the Clyburn Fish Fry, neither he nor anyone else in his car was wearing a pin issued by the Secret Service. SOUF ¶ 166. During the time that Dr. Wilson was outside of the Clyburn Fish Fry and was trying to gain access to the restricted area, Secretary Clinton was on the stage speaking. SOUF ¶ 167. The Clyburn Fish Fry attracted a large crowd and featured amplified music, and people were cheering and screaming. SOUF ¶ 168. When Dr. Wilson tried to gain access to the restricted area, he was stopped by Secret Service agents. SOUF ¶ 169. Dr. Wilson and members of his campaign engaged in a short conversation with the Secret Service agents, which lasted between 6 and 30 seconds. SOUF ¶ 170.

According to Dr. Wilson, he identified himself to the Secret Service agents as a presidential candidate and asked to be admitted. SOUF ¶ 171. The Secret Service agents said, "[y]ou cannot come in, sir." SOUF ¶ 172. According to Dr. Wilson, the Secret Service agents said that if he came in, he would be arrested, but the Secret Service agents did not say anything else to him. SOUF ¶ 173. In particular, the Secret Service agents did not say anything about why he would not be allowed to come in. SOUF ¶¶ 174-75. The only people who Dr. Wilson personally spoke to at the Clyburn Fish Fry were the Secret Service agents and police officers. SOUF ¶ 176. After Dr. Wilson was denied access to the restricted area, he returned to his car and left the Clyburn Fish Fry. SOUF ¶ 177.

Jonathan Metcalf, Dr. Wilson's South Carolina campaign consultant, witnessed the Secret Service turn back Dr. Wilson, but could not overhear the conversation between Dr. Wilson and the Secret Service agents. SOUF ¶ 178. After Dr. Wilson was not permitted to enter the restricted area, Mr. Metcalf did not attempt to find or to speak with any Friends of Jim Clyburn staff member present at the event. SOUF ¶ 179. Nor did Mr. Metcalf, who knew Congressman Clyburn personally, try to speak with Congressman Clyburn at the event. SOUF ¶ 180. After Dr. Wilson had left the Clyburn Fish Fry, Mr. Metcalf located Mr. Harrison. SOUF ¶ 181. Mr. Metcalf engaged in a short conversation with Mr. Harrison. Because of the noise level, Mr. Metcalf and Mr. Harrison had to lean down in order to hear each other. SOUF ¶ 182. Mr. Metcalf asked Mr. Harrison why Dr. Wilson was not able to speak at the Clyburn Fish Fry. SOUF ¶ 183. According to Mr. Metcalf, the only statement that Mr. Harrison made in response was "[i]t's out of my hands." Mr. Harrison told Mr. Metcalf that it was "out of his hands" because the Clyburn Fish Fry was not an SCDP event, and Mr. Harrison, as Chair of the SCDP, did not control the event. SOUF ¶ 184.

Dr. Wilson never asked Mr. Metcalf or anyone else to speak to Congressman Clyburn about why Dr. Wilson was not admitted to the restricted area of the Clyburn Fish Fry to gain access to the stage. SOUF ¶¶ 185. And neither Dr. Wilson nor anybody else from his campaign ever found out any more information about why Dr. Wilson was not allowed by the Secret Service to enter the restricted area at the Clyburn Fish Fry. SOUF ¶ 186. Dr. Wilson does not know Congressman

Clyburn and has never spoken to him about the Clyburn Fish Fry. SOUF ¶ 188. Dr. Wilson and his campaign have no idea whether he was denied entry to the restricted area as a consequence of their failure to coordinate logistics and security or he was excluded intentionally from speaking at the event—and, if it was the latter, whether it was at Congressman Clyburn's request and what motivated his decision. SOUF ¶ 190.

## IV.    LEGAL STANDARD

Summary judgment is proper if, based on the evidentiary record, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment." *Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008). Similarly, self-serving and conclusory allegations are insufficient to create a genuine issue of material fact or to demonstrate the moving party's entitlement to relief, as are opinions and legal conclusions. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999).

The burden on a defendant moving for summary judgment may be discharged without factual disproof of the plaintiff's case; the defendant need only identify the ways in which the plaintiff has failed to come forward with sufficient evidence to support a reasonable jury finding in its favor on one or more elements of its claim. *Grimes v. D.C.*, 794 F.3d 83, 93 (D.C. Cir. 2015). The fundamental questions on summary judgment are (1) whether the movant has borne its "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," and, if so, (2) whether the nonmoving party has borne its burden "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 94-95 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

<h1 style="text-align:center">V.   ARGUMENT</h1>

**A.   Summary Judgment Should Be Granted Against Plaintiffs' Section 1981 Claim.**

Section 1981 protects the right "to make and enforce contracts" free from racial discrimination. *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). For purposes of summary judgment, the operative question under Section 1981 is whether Plaintiffs produced sufficient evidence for a reasonable jury to find that the DNC intentionally discriminated against Plaintiffs on the basis of race in the making of a contract for use of the DNC's Voter File. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).

There are two ways that Plaintiffs may meet their burden of producing evidence of intentional racial discrimination on the part of the DNC. A plaintiff may prove a discrimination claim by direct evidence of racially discriminatory intent—in particular, a statement that itself shows racial bias in the contracting decision. *See id.* (citing *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)). Here, the record has no such direct evidence of racially discriminatory intent. Accordingly, in order to survive summary judgment, Plaintiffs will instead have to produce evidence sufficient for a reasonable jury to find that the DNC's stated reasons that it did not contract with Plaintiffs for the Voter File are not the actual reasons, and that the DNC intentionally discriminated against Plaintiffs based on Dr. Wilson's race. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). Here, the DNC advances two separate non-discriminatory reasons why it did not enter into a contract with Plaintiffs for use of the DNC's national Voter File: (1) Plaintiffs never actually sought to enter into a contract with the DNC for use of the DNC's national Voter File, and (2) even if Plaintiffs had attempted to contract with the DNC for use of the DNC's national Voter File, the DNC would not have offered the opportunity because Dr. Wilson did not meet the DNC's standards for offering an opportunity to license the Voter File. Plaintiffs have adduced no evidence that the DNC treated similarly-situated white Presidential candidates with whom the DNC contracted for use of the national Voter File more

favorably than Dr. Wilson, for the simple reason that Senator Sanders and Secretary Clinton were not at all similarly situated to Dr. Wilson. *See Nanko Shipping, USA*, 850 F.3d at 467 (describing "treat[ment of a company . . .] less favorably than *similarly situated* white-owned companies" as among "the basic elements of a prima facie case of intentional discrimination") (emphasis added).

### 1. There is No Genuine Dispute that Plaintiffs Never Sought to Contract with the DNC for Use of its Voter File

Summary judgment on Plaintiffs' Section 1981 claim should be granted because Plaintiffs have not established that they ever sought to contract with the DNC for use of the national Voter File. Section 1981's prohibition on racial discrimination in the making of contracts undoubtedly encompasses declining to enter into a contract on the basis of race, but numerous courts have held that Section 1981 plaintiffs must establish that they actively sought to enter into a contract. *See, e.g.*, *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 435 (4th Cir. 2006) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001)) ("[A] plaintiff must establish the loss of an actual, not speculative or prospective, contract interest."); *Green v. Dillard's, Inc.*, 483 F.3d 533, 538 (8th Cir. 2007) (same); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1118 (10th Cir. 2001) (same); *Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996) (same); *Newman v. Borders, Inc.*, 530 F. Supp. 2d 346, 349 (D.D.C. 2008) (same). This is because the plain text of Section 1981 concerns contractual relationships and does not provide a general cause of action for race discrimination. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468 (8th Cir. 2009) (citing *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477 (2006)). For example, in the retail context, courts have found that mere presence at a store is not sufficient to allege that a contractual interest existed. Rather, the plaintiff must have made some tangible attempt to contract by selecting particular items offered by the retailer. *See Newman*, 530 F. Supp. at 349. Similarly, in the public accommodations context, courts have found that plaintiffs' failure to ask to be seated at a restaurant

made a claim of interference with contractual relations too speculative. *See Morris*, 89 F.3d at 414 (discussing *Jackson v. Tyler's Dad's Place, Inc.*, 850 F. Supp. 53 (D.D.C. 1994)).[2]

Plaintiffs cannot establish that they actively sought to enter into a contract with the DNC for use of the DNC's national Voter File. Plaintiffs admit that at the time of their campaign, they were unaware of the existence of the DNC Voter File and have no documents or communications between them and any other person referring to the DNC Voter File, the lease, licensing, or purchase of the DNC Voter File, or plans for the use of the DNC Voter File. SOUF ¶ 69. Plaintiffs admit that they cannot recall when they first learned of the existence of the DNC Voter File and cannot recall if they ever discussed the DNC Voter File with any person. SOUF ¶ 70 (citing Plaintiffs' Response to Interrogatory Responses at 5).[3]

---

[2] Cases typically discuss the requirement that Section 1981 Plaintiffs establish that they actively sought to enter into a contract as a required element of Plaintiffs' prima facie case under the *McDonnell Douglas* burden-shifting framework. Since the D.C. Circuit's decision in *Brady*, whether a plaintiff made out a prima facie case is of lesser importance in Section 1981 cases. Instead, evidence (or a lack thereof) of an element of the prima facie case is relevant to the determination at summary judgment of whether the Plaintiff has produced evidence of intentional discrimination. *See Brady*, 520 F.3d at 494 n.2; *see also Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008) (holding that court "must determine whether a reasonable jury 'could infer discrimination' *based on the prima facie case*, the plaintiff's challenge to the [defendant]'s proffered justification, and any other evidence of discrimination.") (emphasis added). Here, Plaintiffs' failure to actively seek to enter a contract with the DNC for use of the DNC voter file is highly relevant to the intentional discrimination claim because it is one of the reasons that the DNC did not enter into a contract with Plaintiffs. Plaintiff's failure to actively seek to enter a contract with the DNC for use of the voter file is also independently relevant to whether Plaintiffs can establish a contractual interest protected by Section 1981 at all. *See Denny*, 456 F.3d at 434 ("To prove a § 1981 claim, therefore, a plaintiff must ultimately establish *both* that the defendant intended to discriminate on the basis of race, *and* that the discrimination interfered with a contractual interest.") (emphasis added).

[3] Plaintiffs are bound by this interrogatory answer despite Dr. Wilson's deposition testimony that he asked about a DNC voter file. *See* Marshall Decl., Ex. Q (Wilson Tr.) 111:19-112:5, 113:3-5. First, Plaintiffs cannot effectively change their interrogatory answer by deposition. *See Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) ("Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony. The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the later testimony . . . .") (internal citations and quotation omitted); *see also Fair v. Prime Sec. Distributors, Inc.*, 134 F.3d 371 (6th Cir. 1997) (rejecting later testimony that contradicted prior testimony and stating "[j]ust as we do not allow parties who

Indeed, the Wilson campaign never had any intention of acquiring or using any voter file for its campaign activities, let alone the DNC's national Voter File. The Wilson campaign was aware that voter files existed, and that there were sources other than the DNC where the Wilson campaign could have obtained a voter file. SOUF ¶ 63. Yet the Wilson campaign never attempted to purchase access to a voter file from the DNC, any state Democratic party, any government entity, or any private vendor. SOUF ¶ 62. This was a conscious decision. For example, Dr. Wilson's South Carolina campaign consultant Jonathan Metcalf personally informed Dr. Wilson about the option of obtaining the South Carolina voter file from the South Carolina Democratic Party. SOUF ¶ 71. On five or six different occasions, Mr. Metcalf explained to representatives of the Wilson campaign why they might be inclined to use the South Carolina voter file and advocated that the Wilson campaign contract with the South Carolina Democratic Party for use of the South Carolina voter file. SOUF ¶ 72. However, Dr. Wilson made a strategic decision not to contract with the South Carolina Democratic Party for voter file access for his campaign in South Carolina. SOUF ¶ 74. Dr. Wilson's decision was unsurprising, given the small scale of his campaign. For example, Dr. Wilson personally decided not to take any steps to implement a vote goal and volunteer recruitment goal plan in South Carolina. Implementing such a plan, for which the voter file was a necessary part, would have entailed a larger operation than the number of staff and volunteers that the Wilson campaign had in South Carolina. SOUF ¶ 75. The Wilson campaign

---

have been deposed to create material fact issues simply by submitting later contradictory affidavits, we will not permit [a party] to disavow material fact issues simply by contradicting their own prior testimony") (citing cases); *Huthnance v. D.C.*, 255 F.R.D. 297, 300 (D.D.C. 2008) (noting evidentiary importance of interrogatory responses and opining that "there is no better example of an admission of a party opponent . . . than an answer to an interrogatory") (internal quotations and citations omitted). Here, allowing Plaintiffs to contradict their own interrogatory response would particularly prejudice the DNC, because Dr. Wilson's deposition was held after the deadline to seek depositions of the meeting's other attendees. Second, Dr. Wilson's testimony suggests he asked about the *Iowa* voter file, Marshall Decl., Ex. Q (Wilson Tr.) 112:3-5, which the DNC did not license to any Presidential candidate, SOUF ¶ 32. Third, even if Dr. Wilson had asked a question about the voter file at a single meeting (and then never followed up), that does not demonstrate Plaintiffs intended to seek a contract to license a voter file, an expense the evidence shows that the Wilson campaign repeatedly decided not to incur, even with respect to a single state's voter file. SOUF ¶¶ 73-74.

had no written plan for what the campaign would do with a voter file, SOUF ¶ 65, and never figured out how many volunteers and staff it required to use a voter file effectively, SOUF ¶¶ 66-67.

Given that Plaintiffs never even sought to enter into a contract with the DNC for use of the DNC's national Voter File (in fact, it never even attempted to obtain or use *any* voter file for its campaign), no reasonable jury could find that the DNC discriminated against Dr. Wilson on the basis of his race because it did not enter into a contract with Dr. Wilson for use of the DNC's Voter File. For this reason, Plaintiffs also fail to establish that they had a contractual interest protected by Section 1981 at all. *See Denny*, 456 F.3d at 434. For these reasons alone, the DNC is therefore entitled to summary judgment on the Plaintiffs' Section 1981 claim.

**2.      Dr. Wilson Is Not Similarly Situated to the Candidates Offered the Opportunity to Contract for the Voter File**

Summary judgment on Plaintiffs' Section 1981 claim should also be granted because Plaintiffs have not established that Dr. Wilson is similarly situated to the two candidates with whom the DNC contracted for the Voter File, such that a reasonable jury could infer that the DNC intentionally discriminated on the basis of Dr. Wilson's race when it did not contract with his campaign for use of the DNC Voter File. The SAC alleges that not licensing the Voter File to Wilson violated Section 1981 because "the DNC failed to accorded [*sic*] candidate Wilson and his campaign the same treatment, accorded to other similarly situated Democratic candidates and campaigns for president." Pls.' Opp'n MTD, ECF No. 27, at 11; *see also* SAC, ECF No. 25, ¶ 87. The Court held that, at the pleadings stage, Plaintiffs had adequately alleged "the DNC provided this contract opportunity to Bernie Sanders—a white candidate who was similarly situated in that he also registered with the Federal Election Commission and contacted the DNC." Memo. Op., ECF No. 29, at 11. To withstand summary judgment, Plaintiffs must now produce evidence to show that there is a genuine issue of fact regarding whether Dr. Wilson's campaign was similarly situated to Senator Sanders's or Secretary Clinton's campaigns. "'[T]he similarly situated inquiry is not a mechanical comparison,' but 'requires enough common factors to determine if intentional

discrimination was at play' by 'eliminating confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.'" *Burton v. D.C.*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015) (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).

In its Memorandum Opinion on the Motion to Dismiss, the Court rightly questioned whether "the DNC would actually be willing to share its sensitive voter data with just any candidate—regardless of race—who meets the minimum standards for candidacy," (i.e., filing with the FEC). Memo. Op., ECF No. 29, at 11. The Court's intuition was correct. In 2016, the DNC offered a baseline level of engagement with any bona fide Democratic presidential candidate who filed with the FEC, which included the provision of information about delegate selection and ballot access. SOUF ¶ 13. However, the DNC imposed additional threshold requirements for candidates to receive additional engagement and resources from the DNC. SOUF ¶ 11. The DNC imposed a requirement that in order to participate in DNC debates and DNC-sponsored events, a candidate must have formally filed with the FEC and must have polled at a minimum of 1% in three separate national polls, conducted by credible news organizations and polling organizations at least six weeks before the event ("the 1% polling threshold"). SOUF ¶ 16. For engagement with the DNC beyond participation in debates and events, the DNC considered additional standards. In particular, the DNC decided whether to enter into a license agreement with presidential campaigns for use of the DNC Voter File based on whether the campaign had a realistic chance of competing in enough states' primary contests and amassing enough delegates to earn the party's nomination for President. SOUF ¶ 38. The factors that the DNC considered included a presidential campaign's support among members of the Democratic party as measured by public opinion polls and fundraising, including both the amount of funds raised and the number of donors. The DNC also considered whether the campaign had a demonstrated ability and commitment to raise funds for the DNC to support the ongoing creation and maintenance of the DNC Voter File, and to employ campaign staff with sufficient experience and training to exercise responsible stewardship of the party's data. SOUF ¶ 39. In the end, the DNC did not contract for access to its national Voter File

with every candidate who filed with the FEC—far from it—or even every candidate who exceeded the 1% polling threshold for participation in DNC debates and events. SOUF ¶¶ 35-37, 40-41. Of the 227 Democratic presidential candidates who filed with the FEC—many if not most of whom were white—the DNC only contracted to provide access to its Voter File with the campaigns of Secretary Clinton and Senator Sanders. SOUF ¶¶ 3, 37, 40-42.

Dr. Wilson was not similarly situated to Senator Sanders or Secretary Clinton on any— let alone all—of these factors. Most obviously, there is no genuine dispute that Dr. Wilson had nowhere near the level of measurable support among members of the Democratic party as Senator Sanders or Secretary Clinton. Plaintiffs admit that during the 2016 presidential campaign, there was not a single public opinion poll that measured opinions regarding or support for Dr. Wilson, or otherwise referred to Dr. Wilson in any way. SOUF ¶ 50. As a result, Dr. Wilson did not even qualify to participate in the DNC's debates, let alone meet the additional standards used by the DNC to determine whether to enter into licensing agreements for its Voter File. In contrast, Secretary Clinton and Senator Sanders both polled in double digits throughout most of 2015. Public support is undeniably relevant to a political party's treatment of candidates seeking that party's nomination for office. *See LaRouche v. Fowler*, 152 F.3d 974, 996 (D.C. Cir. 1998) (quoting *Ripon v. Nat'l Republican Party*, 525 F.2d 567, 586–87 (D.C. Cir. 1975) (recognizing "'legitimate interest of the party in winning elections'"); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (citing *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)) (discussing special protection the First Amendment reserves for the process by which a political party "'select[s] a standard bearer who best represents the party's ideologies and preferences.'"). Even *state actors* may impose threshold requirements related to public support when distinguishing among candidates. *See, e.g., Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 670-72, 681, 683 (1998) (permitting exclusion from debate based on candidate's "objective lack of support").

The yawning gulf in demonstrated public support between Dr. Wilson and the two leading candidates for the Democratic nomination to whom the DNC licensed its Voter File shows there

is no genuine dispute that Dr. Wilson did not meet the DNC's "ordinary requirements" for a contract "ordinarily provided by the defendant to other *similarly situated* customers," *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004) (emphasis added). This itself is sufficient for summary judgment of a Section 1981 claim. *See, e.g.*, *Black Educ. Network, Inc. v. AT & T Broadband, LLC*, 154 F. App'x 33, 41 (10th Cir. 2005) (affirming summary judgment of § 1981 claim when plaintiff failed to satisfy the minimum bid requirements outlined by defendants); *Coward v. ADT Sec. Sys., Inc.*, 140 F.3d 271, 275 (D.C. Cir. 1998) (affirming summary judgment of Section 1981 claim because employees held different qualifications); *Morris v. Carter Goble Lee, Inc.*, 113 F. Supp. 3d 289, 297 (D.D.C. 2015) (granting summary judgment of Section 1981 claim because "[t]he evidence Plaintiff provided regarding a white employee that he claims was not disciplined for certain alleged infractions fails because Plaintiff has not shown that he was similarly situated to that employee."); *Big Apple Tire, Inc. v. Telesector Res. Grp., Inc.*, 476 F. Supp. 2d 314, 326 (S.D.N.Y. 2007) (granting summary judgment of Section 1981 claim because comparators were "much bigger" than plaintiff).

Moreover, Dr. Wilson was in no way similarly situated to Senator Sanders and Secretary Clinton on the other factors that the DNC considered when deciding whether to contract for access to the DNC's national Voter File. Dr. Wilson only managed to attain ballot access in 9 states and did not obtain ballot access in the critical early state primary of New Hampshire. SOUF ¶¶ 52-53. The Clinton and Sanders campaigns attained ballot access in every primary, which made it possible for them to amass enough delegates to have a chance at earning the party's nomination. SOUF ¶ 51. By the end of 2015, Senator Sanders and Secretary Clinton had each raised tens of millions of dollars from tens of thousands of individual donors, while Dr. Wilson had raised less than $10,000 from fewer than 40 donors. SOUF ¶¶ 57-60. Moreover, as discussed above, Plaintiffs did not seek any other voter file from a government entity or private vendor and had no plan in place for what the campaign would do with a voter file or the campaign staff to appropriately protect and use the DNC's data. SOUF ¶¶ 61, 65.

In the end, there is no genuine dispute that Plaintiffs ran a small, largely self-financed presidential campaign in a limited number of states, which had neither the infrastructure nor the inclination to use any voter file for their campaign. Dr. Wilson's candidacy never registered any public support in any public polls. Because Plaintiffs cannot establish a genuine dispute of fact whether Dr. Wilson is similarly situated to the two candidates to whom the DNC licensed its Voter File—who were the undisputed frontrunners for the Party's nomination—no reasonable jury could find that the DNC discriminated against Dr. Wilson on the basis of his race when it did not enter into a contract with Dr. Wilson for use of the DNC's national Voter File. Accordingly, the DNC is entitled to summary judgment on the Section 1981 claim.

**B.**     **Summary Judgment Should Be Granted Against Plaintiffs' Section 1985 Claim.**

Plaintiffs' second remaining claim asserts that the DNC violated his civil rights by conspiring to prevent him by force, intimidation, or threat from lawfully advocating for his election at the Clyburn Fish Fry. It is undisputed that Dr. Wilson was not wearing a Secret Service lapel pin the night of the event and that the Secret Service did not allow Dr. Wilson into the restricted area it had established. Plaintiffs have no evidence suggesting why the Secret Service did so. In particular, there is no evidence to show that Dr. Wilson's lack of a lapel pin was anything other than the result of his own staff failing to contact the Clyburn Fish Fry's organizers to coordinate logistics and security.[4] And, most critically, there is no evidence that the DNC had any role in organizing the Clyburn Fish Fry or determining whether Dr. Wilson would speak at the event; indeed, the DNC presents unrebutted evidence it did not. SOUF ¶¶ 148-51, 153.

Plaintiffs' Section 1985 claim requires they establish "four elements: '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is

---

[4] Even if Plaintiffs were able to show Dr. Wilson were intentionally stopped from speaking at the Clyburn Fish Fry, they have no evidence as to who intended that outcome, including no evidence that, as of the night of Fish Fry, Congressman Clyburn wanted him to speak at his event at all. SOUF ¶¶ 189-90. In fact, no one affiliated with Plaintiffs ever bothered to ask Congressman Clyburn or his staff what happened that night. SOUF ¶ 187.

either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" Memo. Op., ECF No. 29, at 11 (citing *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986)). The Court previously held that Section 1985(3) defines four ways in which a conspiracy could deprive a plaintiff of the equal protection of the laws, but that only one is relevant here: A conspiracy falls within the scope of Section 1985 if it seeks "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President." Memo. Op., ECF No. 29, at 11-12 (quoting 42 U.S.C. § 1985(3) cl. 3) ("Clause 3").

As a result, in order to survive a motion for summary judgment on their claim under Clause 3, Plaintiffs have the burden of establishing at least three essential elements of a conspiracy. Plaintiffs' failure to establish any one of these three elements is sufficient to grant summary judgment against Plaintiffs' claim under Clause 3.

First, Plaintiffs must establish the existence of a conspiracy involving the DNC to prevent Dr. Wilson, through force, intimidation, or threat, from advocating for his candidacy at the Clyburn Fish Fry. This means that Plaintiffs must establish "facts showing the existence of an agreement, or 'meeting of the minds', between [multiple parties] to violate plaintiff's civil rights." *Knowlton v. United States*, 111 F. Supp. 2d 1, 8 (D.D.C. 1999), *aff'd sub nom. Knowlton v. Alouri*, No. 96CV02467, 2000 WL 1093323 (D.C. Cir. June 27, 2000) (granting summary judgment against conspiracy claim).

Second, in the context of a claim under Clause 3, Plaintiffs must establish that Dr. Wilson was prevented from giving his support or advocacy for his own campaign "in a legal manner." *See* 42 U.S.C. § 1985(3) ("if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy *in a legal manner*") (emphasis added).

Third, Plaintiffs must establish that the co-conspirators committed an unlawful act. *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997) ("A civil conspiracy is 'a combination of

two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means . . . .'").

### 1. Plaintiffs Have Not Demonstrated that the DNC Entered into an Agreement with the Secret Service or Any Other Person to Prevent Dr. Wilson, through Force, Intimidation, or Threat, From Advocating for His Candidacy at the Clyburn Fish Fry

Summary judgment on Plaintiffs' Section 1985(3) claim should be granted because Plaintiffs have not established that the DNC ever entered into an agreement to prevent Dr. Wilson from advocating for his candidacy, much less agreeing to do so using force, intimidation, or threat. The threshold requirement to establish a conspiracy under Section 1985(3) is an agreement between the conspirators to inflict a wrong against or injury upon another. *See McManus v. D.C.*, 530 F. Supp. 2d 46, 74 (D.D.C. 2007). In other words, Plaintiffs must establish that there was a "meeting of the minds" between the DNC and other members of the conspiracy to prevent Dr. Wilson from advocating for his candidacy using force, intimidation, or threat. *See, e.g.*, *Graves*, 961 F. Supp. at 320 (discussing conspiracy under clause 1 of Section 1985(3), dismissing action for failing to allege that there was an agreement by defendants to keep plaintiff underemployed because of his membership in a protected class). In order to establish the existence of such a meeting of the minds, it is not enough for Plaintiffs merely to point to actions consistent with a conspiratorial agreement that are equally explained by legitimate and lawful behavior. *See, e.g.*, *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051–52 (D.C. Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)) (discussing conspiracy to violate a RICO predicate, holding that allegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives, do not suffice to show illegality); *Kurd v. Republic of Turkey*, No. CV 18-1117 (CKK), 2019 WL 1243731, at *19 (D.D.C. Mar. 18, 2019) (discussing conspiracy under clause 1 of Section 1985(3) holding that a common goal, never discussed explicitly or implicitly among the Defendants, does not constitute an agreement because parallel conduct could just as well be independent action) (citing *Twombly*, 550 U.S. at 557); *cf. Freedom Watch, Inc. v. Google, Inc.*, No. 1:18-CV-02030

(TNM), 2019 WL 1201549, at *4 (D.D.C. Mar. 14, 2019) (discussing conspiracy under Sherman Act, finding that though Plaintiffs sufficiently alleged social media platforms acted to suppress or censor conservative content, Plaintiffs presented no facts excluding the possibility that the alleged conspirators were acting alone and thereby failed to show how the platforms' purportedly parallel actions stem from a conspiracy).

Plaintiffs have elicited no evidence of a meeting of the minds between the DNC and anyone else, including the Secret Service, related in any way to Dr. Wilson's participation at the Clyburn Fish Fry—let alone an agreement between the DNC and anybody else—to prevent Dr. Wilson from advocating for his campaign using force, intimidation, or threat.

Indeed, the evidence all points in the opposite direction. For example, there is no genuine dispute that the Clyburn Fish Fry was an event organized and paid for by Clyburn for Congress, that Congressman Clyburn decided who was invited to speak, and that the DNC did not have a role in planning the event, inviting speakers, or coordinating logistics with the Secret Service. SOUF ¶¶ 148-53.[5] There is no genuine dispute that the DNC's only involvement in the Clyburn Fish Fry was the speech that Congressman Clyburn invited DNC Chair Wasserman Schultz to deliver at the event. SOUF ¶ 132. Congresswoman Wasserman Schultz's mere presence at the Clyburn Fish Fry, and the fact that she may have been standing in the crowd nearby when Dr. Wilson spoke to the Secret Service, provides no inference of an agreement between the DNC and anyone else to prevent Dr. Wilson from advocating for his campaign using force, intimidation, or threat. There is no genuine dispute that Congresswoman Wasserman Schultz did not participate in

---

[5] The SAC alleged that the Clyburn Fish Fry was an event "*co-sponsored by the DNC* and the South Carolina Democratic Committee" and that the DNC "had a duty to intervene to ensure that candidates . . . were treated impartially and fairly *in its sponsored campaign events*[,]" ECF No. 25 at 19 (¶¶ 98, 100) (emphasis added), an allegation that the Court relied upon in its Memorandum and Opinion on the DNC's Motion to Dismiss, *see* ECF No. 29, at 12. In fact, all documentation in Plaintiffs' possession from the event organizers indicated the opposite: that the event was sponsored by Friends of Jim Clyburn and made no mention whatsoever of the DNC. SOUF ¶ 121. In fact, Plaintiffs' own internal campaign scheduling materials described the event as the Jim Clyburn Fish Fry and made no mention of the DNC. SOUF ¶ 123. And despite Plaintiffs' allegation that the Clyburn Fish Fry was purportedly a DNC-sponsored event, Plaintiffs admit that they never spoke with anyone with the DNC regarding the event. SOUF ¶ 193.

the interaction between Dr. Wilson and the Secret Service; Dr. Wilson did not even see her at the event. SOUF ¶ 149.

The fact that nobody from the DNC intervened when the Secret Service prevented Dr. Wilson from entering the restricted area similarly provides no inference of an agreement between the DNC and anyone else to prevent Dr. Wilson from advocating for his campaign using force, intimidation, or threat. As an initial matter, Plaintiffs fail to establish that any employee or officer of the DNC was even aware that the Secret Service had prevented Dr. Wilson from entering the restricted area. There is no genuine dispute that no member of Dr. Wilson's campaign ever spoke with—or even attempted to speak with—Congresswoman Wasserman Schultz or any other DNC employee at or after the Clyburn Fish Fry. SOUF ¶ 187.[6] There is no genuine dispute that Mr. Harrison, the only person whom the Plaintiffs claim they attempted to speak with regarding why Dr. Wilson could not get into the restricted area at the event, never discussed the matter with anyone from the DNC. SOUF ¶ 150. And there is no evidence that Congresswoman Wasserman Schultz or anyone else from the DNC witnessed the interaction between the Secret Service and Dr. Wilson. There is no dispute that there were hundreds of people in attendance and that the event was very noisy, with people cheering and screaming and music playing. SOUF ¶ 168.

But even if Plaintiffs could establish that the DNC was somehow aware that Dr. Wilson had not been allowed into the restricted area by the Secret Service, that awareness would not be evidence of an agreement by the DNC to prevent Dr. Wilson from advocating for his candidacy using force, intimidation, or threat. There is no genuine dispute that the Secret Service has the statutory authority to restrict access to an area of a building where a person protected by the Secret Service is visiting, and that a protected person (Secretary Clinton) was in fact present during the

---

[6] The SAC alleged that Dr. Wilson's representatives "sought intervention from the South Carolina Democratic Committee officials *and DNC officials*[,]" ECF No. 25 at 19 ¶¶ 99 (emphasis added), an allegation that the Court relied upon in its Memorandum and Opinion on the DNC's Motion to Dismiss, *see* ECF No. 29, at 12. In fact, Plaintiffs admitted that they never even attempted to speak with anyone from the DNC at the Clyburn Fish Fry, SOUF ¶ 193, and that the only person with whom they attempted to speak with regarding why Dr. Wilson could not get into the restricted area was SCDP Chairman Jaime Harrison, SOUF ¶¶ 179-187.

events in question. SOUF ¶¶ 125, 134, 139. As discussed above, the DNC had no role in planning the event, inviting speakers, or coordinating logistics with the Secret Service. SOUF ¶ 150. Accordingly, an employee or officer of the DNC would have had no basis to intervene with the Secret Service or purport to instruct them to admit Dr. Wilson to the restricted area. Indeed, inaction on the DNC's part—even if it were somehow consistent with the existence of an agreement—is precisely the kind of parallel conduct that is equally (and in fact, more likely) explained by lawful behavior. *See, e.g.*, *RSM Prod. Corp.*, 682 F.3d at 1052. It would be perfectly reasonable for an employee or officer of the DNC not to interfere with the Secret Service's determination, perhaps on the belief that staffers for Friends of Jim Clyburn would resolve any mistake or misunderstanding, regarding which persons were permitted to enter the restricted area.

Because Plaintiffs cannot establish a genuine dispute of fact that the DNC entered into an agreement with anyone to prevent Dr. Wilson from advocating for his candidacy at the Clyburn Fish Fry using force, intimidation, or threat, the DNC is entitled to summary judgment.

> **2.    Plaintiffs Have Not Even Demonstrated that Dr. Wilson Should Have Been Granted Access to the Restricted Area at the Clyburn Fish Fry or that Dr. Wilson Should Have Been Able to Speak at the Clyburn Fish Fry**

Summary judgment on Plaintiffs' Section 1985(3) claim should be granted for the independent reason that Plaintiffs have not even demonstrated that Dr. Wilson should have been granted access to the restricted area at the Clyburn Fish Fry, or that he should have been able to speak at the event. In the context of a claim under Clause 3, Plaintiffs must establish that Dr. Wilson was prevented from giving his support or advocacy for his own campaign "in a legal manner." *See* 42 U.S.C. § 1985(3) ("if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy *in a legal manner*") (emphasis added).

In the ordinary case brought under Clause 3, it should not be difficult for a plaintiff to demonstrate that they were attempting to give their support or advocacy in a legal manner: for example, in *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, the claim involved a group of eligible voters whom the defendant accused of having

committed felony voter fraud in order to intimidate and prevent them from voting or registering to vote. No. 1:18-CV-00423, 2018 WL 3848404, at *1 (E.D. Va. Aug. 13, 2018); *see also* Compl., ECF No. 1, at 21 ¶ 54; *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found*, 1:18-CV-00423 (Apr. 12, 2018). Because the *LULAC* plaintiffs were eligible to vote, there is no question that by registering to vote and voting, they would be giving their support or advocacy "in a legal manner." 42 U.S.C. § 1985(3). In this case, which involves a candidate's attempt to advocate for his candidacy by giving a speech at a private event, for Plaintiffs to demonstrate that Dr. Wilson was prevented from giving his support for his candidacy in a legal manner, Plaintiffs must first establish that Dr. Wilson should have been granted access to the restricted area and been able to speak at the Clyburn Fish Fry. If Section 1985 plaintiffs did not have to make such a basic showing, any self-declared candidate—or any of their supporters— could proceed on a claim under Clause 3 simply because security personnel prevented them from entering or speaking at a private political event, even if the host of the event never extended an invitation in the first place, or if the host decided to change their plans and rescind an invitation. Such an interpretation of Section 1985(3) would present direct conflict with well-established First Amendment doctrine on forced speech and forced association. *See, e.g.*, *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 172 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) (citing *Democratic Party v. Wisconsin*, 450 U.S. 107, 122 (1981) ("[T]he freedom to associate for the 'common advancement of political beliefs' necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.")).[7]

Here, Plaintiffs cannot make even the minimal showing that Dr. Wilson should have been granted access to the restricted area at the Clyburn Fish Fry or that Dr. Wilson should have been able to speak at the event. Rather, while Congressman Clyburn may have at one point extended an

---

[7] Indeed, courts have held that even *state actors* may deny supporters of one candidate admission to another campaign's rally on public property, as the rally organizers had a First Amendment right to hold a rally without having to tolerate simultaneous discordant statements. *See, e.g.*, *Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996).

invitation to Presidential candidates appearing on the South Carolina Democratic Party's Presidential Primary ballot to speak at the Clyburn Fish Fry, Plaintiffs have proffered no evidence that they took any action to inform the event's organizers that Dr. Wilson intended to speak at the event or to confirm the logistical details needed for Dr. Wilson to clear security. To the contrary, there is no genuine dispute that Dr. Wilson and his campaign are unaware of any communication between the Wilson campaign and the organizers of the Clyburn Fish Fry other than the letter signed by Congressman Clyburn. SOUF ¶ 155. Given that Dr. Wilson and his campaign never communicated with the organizers of the Clyburn Fish Fry, it is not surprising that there is no genuine dispute that Dr. Wilson and his campaign had no information about with whom he was supposed to check in when he arrived at the Clyburn Fish Fry, or any information about security at the Clyburn Fish Fry, or any information about what he would need in order to be admitted into a restricted area controlled by the Secret Service at the event. SOUF ¶ 157. Dr. Wilson admitted that he does not know Congressman Clyburn and has never spoken to him about the Clyburn Fish Fry. SOUF ¶ 188. Dr. Wilson's South Carolina political consultant Jonathan Metcalf—who knows Congressman Clyburn personally—admitted that he did not attempt to speak with Congressman Clyburn or any Friends of Jim Clyburn staff members present at the event. SOUF ¶ 180. And Dr. Wilson admitted that neither he nor anybody from his campaign ever attempted to speak to Congressman Clyburn about what happened at the Clyburn Fish Fry. SOUF ¶ 187.

Plaintiffs' lack of communication and coordination with the organizers of the Clyburn Fish Fry stands in sharp contrast to their interactions with the South Carolina Democratic Party, who invited Dr. Wilson to address the First in the South Dinner. Dr. Wilson and his campaign staff directly corresponded with SCDP officials about event logistics, the campaign's list of guests who would be attending the event, and even sent Mr. Harrison a copy of Dr. Wilson's speech. SOUF ¶ 137. Plaintiffs made no such efforts for the Clyburn Fish Fry. Instead, Dr. Wilson admitted that, apart from pointing to a generic letter addressed to all candidates, he still has no idea whether Congressman Clyburn wanted Dr. Wilson to speak at the Clyburn Fish Fry or whether

Congressman Clyburn decided not to choose him as a speaker for the Clyburn Fish Fry. SOUF ¶ 190.

Because Plaintiffs cannot establish a genuine dispute of fact that Dr. Wilson was prevented from advocating for his candidacy in a legal manner, the DNC is entitled to summary judgment.

### 3. Plaintiffs Have Not Demonstrated that the Secret Service's Actions Were Illegal

Summary judgment on Plaintiffs' Section 1985(3) claim should also be granted because Plaintiffs have proffered no evidence that the Secret Service acted unlawfully when it denied Dr. Wilson access to the restricted area. Section 1985 plaintiffs must allege the elements of civil conspiracy, which includes "an agreement to take part in an unlawful action or a lawful action in an unlawful manner." *See, e.g.*, *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) (citing *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002)).

Put another way, Plaintiffs must establish that by preventing Dr. Wilson from entering the restricted area behind the Clyburn Fish Fry stage, the Secret Service was acting unlawfully. Plaintiffs fail to do so. Federal law authorizes the United States Secret Service to protect spouses of former Presidents, including Secretary Clinton, for their lifetimes. 18 U.S.C. § 3056(a)(3). Federal law also prohibits persons from knowingly entering or remaining without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting, 18 U.S.C. § 1752(a)(1), (c), and authorizes the Secret Service to arrest any person who violates this prohibition. 18 U.S.C. § 3056(c), (d).

At the Clyburn Fish Fry, the Secret Service limited access to the restricted area behind the event stage to authorized persons and issued lapel pins to persons who were authorized to access the restricted area. SOUF ¶¶ 158-59. For example, the Secret Service prevented Mr. Harrison, the Chairman of the South Carolina Democratic Party, from entering the restricted area behind the stage because he was not wearing such a pin. SOUF ¶¶ 160-62. The Secret Service refused to admit Mr. Harrison even after he informed the Secret Service of his identity and position as the Chairman

- 29 -

of the SCDP. Mr. Harrison was only able to enter after he found a Friends of Jim Clyburn staff member wearing an issued pin, who asked the Secret Service to let Mr. Harrison through. SOUF ¶¶ 163-64. It is undisputed that, like Mr. Harrison, neither Dr. Wilson nor anybody in his entourage was wearing a Secret Service-issued lapel pin at the Clyburn Fish Fry. SOUF ¶ 166. It is therefore unsurprising that, just like Mr. Harrison, the Secret Service did not allow Dr. Wilson to enter the restricted area even after he informed the Secret Service of his name and status as a presidential candidate. The Secret Service's actions were fully consistent with its statutory authority to establish a restricted area and limit access to authorized persons, and in no way reflects unlawfulness or illegality. Indeed, if the Secret Service admitted to restricted areas all persons who just *said* they were presidential candidates, the security perimeters they routinely establish at campaign events would be entirely permeable.

Even if Plaintiffs had established that Dr. Wilson should have been admitted to the restricted area because the organizers wished him to speak at the Clyburn Fish Fry—and as discussed above, they have not—Plaintiffs would still fail to establish that the Secret Service's actions were unlawful. There is no evidence that the Secret Service had intentionally denied access to persons authorized to enter the restricted area. There is no evidence that someone intercepted and discarded Secret Service lapel pins that event organizers attempted to deliver to Dr. Wilson's campaign or the Secret Service had access to a VIP list with Dr. Wilson's name. And there is no evidence that anyone intervened with an event organizer and prevented them from admitting Dr. Wilson. To the contrary, after the Secret Service prevented Dr. Wilson from entering the restricted area, he left the event, and nobody on his campaign staff attempted to find or speak to Congressman Clyburn or a Friends of Jim Clyburn staff member. SOUF ¶¶ 177, 187. The only person who Plaintiffs even attempted to speak with about why Dr. Wilson could not get into the restricted area at the event was Mr. Harrison, who was not an organizer of the event (or, in any case, a representative of the DNC). SOUF ¶¶ 181-84.

Because Plaintiffs cannot establish a genuine dispute of fact that any purported conspirators undertook an unlawful action, the DNC is entitled to summary judgment.

## VI.     CONCLUSION

For the reasons set forth above, the DNC respectfully requests that its motion for summary judgment be granted and judgment be entered for the Defendant.

Dated: April 15, 2019                                    Respectfully submitted,

**PERKINS COIE LLP**

By: /s/ Bruce V. Spiva
     Bruce V. Spiva, Bar No. 443754
     BSpiva@perkinscoie.com
     Elisabeth C. Frost, Bar No. 1007632
     EFrost@perkinscoie.com
     Brian Simmonds Marshall,
     Bar No. 501670
     BMarshall@perkinscoie.com
     Alexander G. Tischenko,
     Bar No. 263229
     atischenko@perkinscoie.com

     700 Thirteenth Street, N.W., Suite 600
     Washington, D.C.  20005-3960
     Telephone:  202.654.6200
     Facsimile:  202.654.6211

     *Attorneys for Defendant*
     *Democratic National Committee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via the Court's electronic notification system to the following parties on April 15, 2019:

Wayne B. Kendall
Wayne B. Kendall, P.C.
155 Bradford Square, Suite B
Fayetteville, GA 30215
Phone: (770) 778-8810
Email: wbkendall2@yahoo.com

Donald M. Temple
1101 15th St. NW, Suite 910
Washington, DC 20005
Phone: (202) 628-1101
Email: dtemplelaw@gmail.com

*Attorneys for Plaintiffs*
Willie Lee Wilson
Willie Wilson 2016

/s/ Bruce V. Spiva
Bruce V. Spiva
Attorney for Defendant
Democratic National Committee