# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| **WILLIE LEE WILSON** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DNC SERVICES CORPORATION**, <br><br> Defendant. | Case No. 1:17-cv-00730 (TNM) |

## MEMORANDUM OPINION

Willie Lee Wilson ran in the 2016 Democratic presidential primary. Dr. Wilson and his campaign (collectively, "Plaintiffs") claim that the DNC Services Corporation ("DNC") discriminated against him and thwarted his campaign efforts. In an earlier opinion, the Court dismissed most of the Plaintiffs' claims. Their remaining claims arise under 42 U.S.C. §§ 1981 and 1985, and the DNC has moved for summary judgment. For the reasons below, the Court will grant that motion.

## I.

Dr. Wilson is an "African-American entrepreneur, philanthropist, and religious motivational speaker" from Chicago. Pls.' Second Am. Compl. ("Compl.") at 1, ECF No. 25.[1] Dr. Wilson sought the Democratic nomination during the 2016 Presidential election, registering his campaign committee, "Willie Wilson 2016," with the Federal Election Commission ("FEC"). *Id.* His counsel notified the DNC about his campaign in May 2015. Def.'s Reply Statement of

---

[1] All page citations are to the page numbers generated by the Court's CM/ECF system.

Undisputed Material Facts ("Def.'s Statement") at 14, ECF No. 60-1.[2] In July, his counsel contacted the DNC a second time, asking for confirmation that the DNC "recognized" Dr. Wilson and seeking information about the nomination process, the DNC debate schedule, and any other resources the DNC could offer. *Id.* In response, the DNC introduced Dr. Wilson's counsel to its Party Affairs Director, who sent him several documents about the nomination and delegate-selection processes. *Id.* at 16. It also stated that Dr. Wilson's campaign would need to meet certain threshold requirements to participate in either the Democratic primary debates or in a meeting the DNC would hold that August. *Id.* Finally, the DNC offered to answer any more questions and introduced Dr. Wilson's counsel to its National Political Director as a contact for state-specific questions and introductions to state Party leadership. *Id.*

In their Complaint, the Plaintiffs allege that the DNC, "acting through its officers, agents, employees, and other independent contractors and representatives . . . collaborated, conspired, and agreed amongst themselves to hamper, impede and sabotage [the Wilson] campaign." Compl. at 18. They seek $2 million in compensatory damages and $5 million in punitive damages under four theories of recovery: breach of contract, promissory estoppel, race discrimination in violation of 42 U.S.C. § 1981, and conspiracy to violate civil rights under 42 U.S.C. § 1985. *See id.* at 14–20. The DNC moved to dismiss their Complaint. *See* Mot. to Dismiss, ECF No. 26. The Court granted in part and denied in part that motion. *See Wilson v. DNC Servs. Corp.* ("*Wilson I*"), 315 F. Supp. 3d 392, 395 (D.D.C. 2018).

---

[2] In its Reply Statement of Undisputed Material Facts, the DNC attached a chart, summarizing the DNC's statement of undisputed material facts, *see* ECF No. 52-1, the Plaintiffs' responses and objections, *see* ECF No. 59-1, and the DNC's reply. *See* ECF No. 60-1. For ease, the Court will cite this chart for undisputed facts.

Now only two of the Plaintiffs' claims remain. First, they claim that the DNC violated 42 U.S.C. § 1981 by not contracting with Dr. Wilson's campaign—because of his race—to give it access to DNC's national voter file ("Voter File"). *See* Compl. at 12–14. Next, they claim that the DNC conspired to bar Dr. Wilson from speaking at a campaign event in South Carolina. *See id.* at 18–19. The parties have completed discovery, and the DNC now seeks summary judgment on the remaining claims. *See* Mot. for Summ. J. ("Def.'s Br."), ECF No. 52.[3]

## II.

To prevail on a motion for summary judgment, one must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is material if it could alter the outcome of the suit under the substantive governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once this showing has occurred, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials

---

[3] The Court has federal question jurisdiction. *See* 28 U.S.C. § 1331.

cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

At summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

### III.

#### A.

The Plaintiffs claim that the DNC violated 42 U.S.C. § 1981 by not contracting with Dr. Wilson's campaign—because of his race—to give it access to DNC's Voter File. *See* Compl. at 12–14. The Voter File is a complex digital database that combines millions of pieces of information about registered voters. Def.'s Statement at 22. It includes valuable information that is political sensitive and not commercially available. *Id.* at 23. As the Plaintiffs admit, the DNC did not offer every presidential candidate who registered with the FEC the opportunity to use its Voter File. *Id.* at 25. Indeed, the DNC entered into licensing agreements with only two 2016 presidential campaigns: Hillary For America and Bernie 2016. *Id.* at 28.

The Voter File is central to DNC's ability to coordinate strategy for candidates throughout the country for local, state, and national office. *Id.* at 22. To use the Voter File, organizations and campaigns must go through specialized training and hire informational technology staff to set up, maintain, and update the database. *Id.* at 23. In fact, Voter File's users can edit and change information that all users share. *Id.*

4

The parties agree that the DNC did not offer its Voter File to Dr. Wilson and his campaign. *See* Pls.' Mem. in Opp. ("Pls.' Br.") at 10, ECF No. 59; Def.'s Reply at 10 n.5, ECF No. 60. In July 2015, Dr. Wilson's lawyer emailed the DNC, asking: "Would you be able to confirm that Dr. Wilson has been recognized by the DNC, and also share information regarding the 50 state nomination process and debate schedule. Please also let me know if there are any other resources the DNC can offer to candidates." Def's Statement at 14. While this email asked the DNC to identify "any other resources the DNC can offer to candidates," it did not explicitly mention the Voter File. *Id.* Even so, the Plaintiffs claim that the DNC violated Section 1981 because the DNC did not provide them an opportunity to enter into a licensing agreement for its Voter File. Pls.' Br. at 10.

Section 1981 "protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts," including contracts for employment, "without respect for race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006) (quoting 42 U.S.C. § 1981(a) (cleaned up)). To state a claim for racial discrimination under Section 1981, the plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981. *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 44–45 (D.D.C. 2003); *see also Mazloum v. Dist. of Columbia Metro. Police Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C. 2007). As relevant here, among the activities enumerated are "the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(b). Section 1981 "can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982).

Courts analyze Section 1981 claims under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). On summary judgment, the operative question is whether the plaintiff produced enough evidence for a reasonable jury to find that the defendant intentionally discriminated against the plaintiff on the basis of race. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). For example, a plaintiff may show that he was treated less favorably than another similarly situated person of a different race. *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014).

So the plaintiff must first make out a *prima facie* case of racial discrimination. *Mazloum*, 522 F. Supp. 2d at 37. Then the defendant must come forward with a legitimate, nondiscriminatory reason for the challenged action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). If the defendant does so, the *McDonnell Douglas* framework falls away, and the factfinder must decide the ultimate question: has the plaintiff proven intentional discrimination? *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–12 (1993). The plaintiff can survive summary judgment by providing enough evidence for a reasonable jury to find that the defendant's proffered explanation was a pretext for discrimination. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

When the defendant properly presents a legitimate, nondiscriminatory reason, the Court "need not—and should not—decide whether the plaintiff actually made out a *prima facie* case" because it should focus only on the third prong of *McDonnell Douglas*. *Id*. But the Circuit recently emphasized that this "shortcut applies only if the parties properly move past the second step." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019). That is, a court must be careful not to relieve the defendant of its burden "to articulate a legitimate, nondiscriminatory

6

reason for its action." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

As the Plaintiffs admit, the DNC has articulated legitimate, nondiscriminatory reasons why it did not enter into a licensing agreement with the Plaintiffs to use the Voter File. *See* Pls.' Br. at 16. First, the DNC claims that the Plaintiffs never sought to contract with the DNC for use of the Voter File. Def.'s Br. at 18.[4] And even if Plaintiffs had, the DNC would not have contracted with the campaign because Dr. Wilson did not meet the DNC's standards to use the Voter File. *Id.* And the Plaintiffs admit that "the sole remaining issue . . . at this stage is whether genuine issues of material facts exist regarding whether the DNC's reason is its true reason for not disclosing or allowing Plaintiffs' access to the DNC Voter Data File and is thus a pretext for race discrimination." Pls.' Br. at 16. So the Court can turn to the third prong of the *McDonnell Douglas* analysis. *See Figueroa*, 923 F.3d at 1092 (collecting cases in which courts accepted defendants' legitimate, nondiscriminatory reasons without further analysis because of plaintiffs' concessions).

The question is whether the Plaintiffs have presented enough evidence for a jury to find that the DNC's asserted reasons were not the actual reasons that it did not contract with the Plaintiffs and that the DNC intentionally discriminated against Dr. Wilson because of his race. *See Brady*, 520 F.3d at 494. The Plaintiffs have not done so.

---

[4] The DNC insists that the Plaintiffs never sought to contract with the DNC for use of its Voter File. *See* Def.'s Reply at 2. To be sure, the Plaintiffs are coy about whether they even knew this Voter File existed. But, as they point out, Dr. Wilson's counsel asked the DNC to identify "any other resources the DNC can offer to candidates." Def.'s Statement at 16. Because the DNC admits that even if the Plaintiffs *had* asked for the Voter File, it would not have contracted with the Wilson campaign, the Court need not wade into whether the Wilson campaign ever asked for it. The Court gives the Plaintiffs the benefit of the doubt on this question.

The Plaintiffs first complain that the DNC never offered them access to the Voter File. Pls.' Br. at 10–13. The DNC admits as much. *See* Def.'s Reply at 10 n.5. But the Plaintiffs offer no legal authority—and the Court is aware of none—for the argument that the DNC had an obligation to do so. True, a Section 1981 claim may arise "when racial discrimination blocks the creation of a contractual relationship." *Domino's Pizza*, 546 U.S. at 476. But the Plaintiffs offer no evidence that racial animus was why the DNC did not offer them access to the Voter File.

One way to show pretext is to show that similarly situated individuals of a different race received more favorable treatment. *Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008). To do so, the similarly situated comparator must be "nearly identical." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). "A person is similarly situated to the plaintiff if he or she possesses all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019). "What constitutes a 'relevant respect' or characteristic varies based on the context." *Id.*

Of the hundreds of Democratic presidential candidates who filed with the FEC—many of whom were white—the DNC only provided its Voter File to the campaigns of Hillary Clinton and Bernie Sanders. Def.'s Statement at 13; 25. Consider Governor Martin O'Malley, Senator Lincoln Chaffee, and Senator Jim Webb, all high-profile, white candidates for the Democratic presidential nomination. *See id.* at 20; 29. They all qualified for the DNC debates and other DNC sponsored events, but even so, the DNC did not give them access to its Voter File. *See id.*

Dr. Wilson does not seriously claim that he was similarly situated to Mrs. Clinton or Mr. Sanders. *See generally* Pls.' Br. Nor could he. Mrs. Clinton is a former U.S. Senator and

8

Secretary of State, and Mr. Sanders is a former U.S. House Representative and current U.S. Senator. Both had far greater political experience, fundraising success, and public support.

In their summary judgment briefing, the Plaintiffs criticize the DNC's evidence that Dr. Wilson was not similarly situated to Mrs. Clinton or Mr. Sanders. *See, e.g.*, Def.'s Statement at 31; 32. They claim, for example, that the DNC's polling data is inadmissible hearsay. *Id.* But the DNC does not have to prove that Dr. Wilson was *not* similarly situated to Mrs. Clinton or Mr. Sanders. "[T]he burden on a defendant moving for summary judgment may be discharged without factual disproof of the plaintiff's case; the defendant need only identify the ways in which the plaintiff has failed to come forward with sufficient evidence to support a reasonable jury to find in his favor on one or more essential elements of his claim." *Durant v. Dist. of Columbia Gov't*, 875 F.3d 685, 696 (D.C. Cir. 2017) (cleaned up).

In other words, the Plaintiffs have the burden of proof here. *Figueroa*, 923 F.3d at 1086 (explaining that, under *McDonnell Douglas*, once the defendant meets its burden under prong two, the "burden then shifts back" to the plaintiff, "who must prove that, despite the proffered reason, she has been the victim of intentional discrimination"). It is the Plaintiffs who should be trying to show, for instance, that Dr. Wilson was polling near Mrs. Clinton or Mr. Sanders. The DNC does not have to disprove the Plaintiffs' theory.

According to the Plaintiffs, because the DNC did not announce the criteria for candidate access to its Voter File during the early months of the campaign, "the question of similarly situated should conform—absent more—with the then-publicly known qualifications for the Presidency." Pls.' Br. at 13. They offer no legal authority for this bold claim.[5] *See id.* In truth,

---

[5] At times, the Plaintiffs seem to recognize that this claim is a stretch, for example, explaining that "Plaintiff Wilson met the minimum U.S. constitutional criteria and was *arguably* similarly situated with other presidential candidates." Pls.' Br. at 13 (emphasis added).

9

the Plaintiffs must show that proposed similarly situated comparators are "nearly identical" to Dr. Wilson. *See Neuren*, 43 F.3d at 1514.

The Plaintiffs contend that all candidates who met the Constitutional requirements for the presidency were similarly situated. Pls.' Br. at 13. The Constitution only requires: (1) natural-born citizenship, (2) fourteen years of residency in the United States, and (3) thirty-five years old. *See* U.S. Const., Art. II § 1, cl. 5.[6] The DNC does not dispute that Dr. Wilson was qualified, under the Constitution, to run for president. Indeed, Dr. Wilson is like the hundreds of individuals who filed, with the FEC, as presidential candidates for the 2016 Democratic nomination. But most of these candidates, including almost every white candidate, could not access the Voter File—just like Dr. Wilson. The Plaintiffs, however, have not shown that Dr. Wilson is similarly situated to the two candidates who *did* have access to the DNC's Voter File.

According to the DNC, it decided whether to enter into a license agreement for its Voter File based on whether a campaign had a realistic chance of competing in enough states' primary contests and amassing enough delegates to earn the party's nomination. Def.'s Br. at 23. In response, the Plaintiffs, unsurprisingly, complain that the DNC did not announce these criteria during the early months of the campaign. Pls.' Br. at 13.

But the Plaintiffs again lose sight of the burden of proof here. They identify no legal authority for the proposition that the DNC must announce publicly or memorialize in writing their criteria. *Cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (holding that defendant's proffer of unwritten policy satisfied its obligation to provide a nondiscriminatory reason for adverse employment action). In fact, the Plaintiffs seem to conflate the DNC's burden under the

---

[6] Incidentally, the Plaintiffs' definition covers the Republican candidates, arguably suggesting that they, too, should have received access to the DNC Voter File.

10

second prong of *McDonnell Douglas* to articulate a legitimate, nondiscriminatory reason for its action—which they admit the DNC has already cleared—with *their* burden to show that the DNC's proffered justifications were pretextual.

More, on pretext, the Plaintiffs point to no evidence that the DNC did not, in fact, evaluate whether campaigns had a realistic chance of competing in enough state primaries and amassing enough delegates to earn the party's nomination when deciding whether to share its Voter File. For example, they do not identify a similarly situated white candidate who did not meet the DNC's standards but was still offered the opportunity to contract with the DNC. Nor do they argue that the Mrs. Clinton or Mr. Sanders did not, in fact, meet the DNC's standards.

The Plaintiffs are frustrated with the DNC's favoritism. Favoritism, however, differs from racial discrimination. *See De La Fuente v. DNC Servs. Corp.*, No. 18-cv-00336, 2019 WL 1778948, at *8 (D.D.C. Apr. 23, 2019) (dismissing a Section 1981 claim when the plaintiff did not show that the defendant's actions were because of the plaintiff's race); *cf. McNair v. Dist. of Columbia*, 213 F. Supp. 3d 81, 87 (D.D.C. 2016) (holding that the plaintiff failed to support an inference of gender discrimination where her allegations "suggest[ed] that, at best, she was treated differently from all other employees—which presumably includes both men and women"). And political parties do have a "legitimate interest . . . in winning elections." *LaRouche v. Fowler*, 152 F.3d 974, 996 (D.C. Cir. 1998) (cleaned up).

For all these reasons, the Court will grant summary judgment to the DNC on the Plaintiffs' Section 1981 claim.

**B.**

The Plaintiffs also claim that the DNC unlawfully conspired with the Clinton campaign to prevent Dr. Wilson from speaking at an event in South Carolina. *See* Pls.' Br. at 17.

Four candidates were on the ballot for the 2016 Democratic primary in South Carolina: Mrs. Clinton, Mr. O'Malley, Mr. Sanders, and Dr. Wilson. *See* Def.'s Statement at 45. After Dr. Wilson obtained ballot access, he received a letter with the subject line: "Invitation to [South Carolina Democratic Party] First in South Dinner and Congressman Jim Clyburn's World Famous Fish Fry." *Id.* at 50. The letter was signed by the Chair of the South Carolina Democratic Party and Mr. Clyburn, who represents the Sixth Congressional District of South Carolina. *Id.* Notably, no representative of the DNC signed it. *Id.* The letter explained that the South Carolina Democratic Party was "inviting all of the Presidential Candidates appearing on the South Carolina Democratic Party's Presidential ballot to address the Dinner attendees." *Id.* "Each candidate [would] be presented by Congressman Clyburn and given a brief opportunity to speak." *Id.* at 51.

The Clyburn Fish Fry took place right after the First in the South Dinner. The Clyburn Fish Fry was open to the public, and attendees needed no ticket. *Id.* at 58. Some people from the DNC, including the Chair of the DNC, attended. *Id.* at 59. But it is undisputed that neither the South Carolina Democratic Party, nor the DNC, "planned or controlled" the Clyburn Fish Fry. *Id.* at 50. For example, the DNC did not have control over who was invited to speak. *Id.* at 59.

Because Mrs. Clinton attended the Clyburn Fish Fry, the Secret Service was involved in event logistics. *Id.* at 59. The Secret Service established a restricted area behind the event stage and limited access to that area to authorized persons. *Id.* at 61. It issued lapel pins to authorized persons. *Id.* For example, the Chair of the South Carolina Democratic Party tried to enter this

area, but Secret Service agents refused to allow him in until an event organizer, sporting a lapel pin, informed agents that the Chair should be admitted. *Id.* at 61–62.

After the First in the South Dinner, Dr. Wilson went to the Clyburn Fish Fry. *Id.* at 63. When he arrived, he and members of his campaign staff walked behind the event stage. *Id.* They were not wearing pins issued by the Secret Service. *Id.* At the time, Mrs. Clinton was on stage speaking, and the event was noisy with people cheering and music playing. *Id.* When Dr. Wilson tried to enter the restricted area, Secret Service agents stopped him. *Id.* According to Dr. Wilson, he and his campaign staff explained who he was and asked to be admitted. *Id.* The conversation lasted less than 20 seconds. *Id.* at 64. He alleges that agents told him that he could not come in, and if he did, they would arrest him. *Id.* at 64. After this brief interaction, he left. *Id.* at 65.

According to the Plaintiffs, the DNC violated the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), because, they allege, it conspired with the Secret Service to prevent Dr. Wilson from speaking at the Clyburn Fish Fry. *See* Pls.' Br. at 17. Section 1985(3) created a cause of action with four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Pope v. Bond*, 641 F. Supp. 489, 498 (D.D.C. 1986) (citing 42 U.S.C. § 1985(3)). Relevant here: a conspiracy falls under Section 1985(3) if it seeks "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President . . . ." 42 U.S.C. § 1985(3) cl. 3.

The DNC first argues that the Plaintiffs have not created a genuine dispute about whether the DNC entered into a conspiratorial agreement. To prevail on their claim, the Plaintiffs must show "the existence of an agreement, or 'meeting of the minds,' between [multiple parties] to violate plaintiff's civil rights." *Knowlton v. United States*, 111 F. Supp. 2d 1, 8 (D.D.C. 1999), *aff'd, sub nom. Knowlton v. Alouri*, No. 96-cv-02467, 2000 WL 1093323 (D.C. Cir. June 27, 2000).

The Plaintiffs claim, for the first time now, that the DNC was the "alter ego" of the Clinton campaign, and that the DNC and the Clinton campaign were under the "common control and command" of Mrs. Clinton. Pls.' Br. at 17; 19. The Plaintiffs thus ask the Court to impute the "actions by the Hillary Clinton Campaign and its agents" to the DNC. *See id.*

This new theory is somewhat confusing. Presumably, the Plaintiffs seek to show that the DNC and the Clinton campaign are one-in-the-same, *and* the Clinton campaign conspired with the Secret Service—who physically prevented Dr. Wilson from entering the restricted area—from giving his support in a legal manner. And so, by some application of the transitive property, the DNC conspired with the Secret Service.

But there are a couple of problems with this theory. First, it is new. In their Second Amended Complaint, the Plaintiffs adequately alleged "a conspiracy between the DNC and the Secret Service to use intimidation and threats to prevent Dr. Wilson from advocating for his presidential campaign in a legal manner." *See Wilson I*, 315 F. Supp. 3d at 401; *see also* Compl. at 18–19. Now, the Plaintiffs seek to hold the DNC liable for an alleged conspiracy between the Clinton campaign and the Secret Service based on the claim that the Clinton campaign owns and controls the DNC—without even trying to show that the DNC entered into a conspiratorial agreement with the Secret Service. *See* Pls.' Br. at 17–20.

The Plaintiffs may not amend their Complaint through their Opposition to the DNC's Motion for Summary Judgment. *See Larson v. Northrop Corp.*, 21 F.3d 1164, 1173–74 (D.C. Cir. 1994) (affirming district court's grant of summary judgment when the plaintiff "raised the issue for the first time in his opposition to [the defendant's] motion," and failed to adequately plead the new cause of action in his complaint); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). For that reason alone, the Court will reject this new theory of conspiratorial liability.

In any event, the Plaintiffs offer no evidence of this "alter ego" relationship. They do point to the Memorandum of Understanding between the DNC and the Clinton campaign. Pls.' Br. at 19–20. But, to be clear, it is not evidence that the DNC conspired with the Clinton campaign to block Dr. Wilson from speaking at the Clyburn Fish Fry. Rather, according to the Plaintiffs, the Memorandum shows that the DNC was the "alter ego" of the Clinton campaign. Pls.' Br. at 19–20.

The Plaintiffs, however, do not explain how this Memorandum proves that the DNC and the Clinton campaign were "one and the same." Far from establishing exclusive control, the Memorandum made clear that "[n]othing in this agreement shall be construed to violate the DNC's obligations of impartiality and neutrality through the nomination process," and that the DNC "may enter into similar agreements with other candidates." *See* Taylor Dep. at 116:4–118:3, ECF No. 60-5. In short, the Plaintiffs point to this Memorandum, but, without more, it is not enough.

More still, assume the DNC and the Clinton campaign *are* one and the same. The Plaintiffs' sole basis for their contention that the Clinton campaign and the Secret Service

conspired to exclude Dr. Wilson from the event stage is a statement in F. Scott Winslow's affidavit. Mr. Winslow worked for the Wilson campaign. Pls.' Br. at 21. In his affidavit, he said that when they were trying to get into the restricted area, Secret Service agents told him "we know who you are, and we have been ordered not to admit you" and that "I'm on Mrs. Clinton's detail and she gave the order." Winslow Decl. ¶¶ 16–19; ECF No. 59-4. But the agent's purported statement about Mrs. Clinton is double hearsay. It is an out-of-court statement offered for its truth: that the Secret Service agent told Mr. Winslow that Mrs. Clinton told the Secret Service not to admit Dr. Wilson. And the Plaintiffs have not explained why the Court should admit it, either as an exception to or an exclusion from the hearsay rule.[7] So the Court will not consider this statement. Without this statement, the Plaintiffs have identified no evidence suggesting a conspiratorial agreement between the Secret Service and the Clinton campaign.

To survive the DNC's Motion for Summary Judgment, the Plaintiffs must establish that there is, at least, a genuine dispute as to the existence of a conspiracy to prevent Dr. Wilson from advocating his candidacy. *See Knowlton*, 111 F. Supp. 2d at 8. They have not done so, so the Court will grant summary judgment to the DNC.

The Plaintiffs' Section 1985 claim fails for another reason. To prevail, they must establish that Dr. Wilson was prevented from giving his support or advocacy for his own campaign "in a legal manner." *See* 42 U.S.C. § 1985(3). The Plaintiffs argue that Dr. Wilson was an invited speaker at the Fish Fry, and he posed no security threat. Pls.' Br. at 20–22. The

---

[7] For example, the Court would not admit these statements under the co-conspirator exclusion because that exclusion applies only when the party and the declarant are, in fact, co-conspirators. That would require the Plaintiffs to first establish the existence of a conspiracy between the Secret Service and the Clinton campaign, along with the alleged conspiracy between the Clinton campaign and the DNC. The hearsay statement itself cannot be the sole basis for finding that such a conspiracy exists, there must be an independent basis as well. *See* Fed. R. Evid. 801(d)(2)(E); *United States v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992).

DNC insists that the Plaintiffs "have no evidence that any invitation by Congressman Clyburn remained effective when Dr. Wilson attempted to access the podium" because Dr. Wilson's campaign never communicated with the Clyburn Fish Fry's organizers. Def.'s Reply at 26.

But even if he had a valid invitation to speak at the event, there is no evidence that Dr. Wilson was legally entitled to enter the restricted area. Federal law authorizes the Secret Service to protect spouses of former Presidents, including Mrs. Clinton, for their lifetimes. 18 U.S.C. § 3056(a)(3). Federal law also prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. 18 U.S.C. § 1752(a)(1), (c). And it authorizes the Secret Service to arrest any person who violates this prohibition. 18 U.S.C. § 3056(c), (d).

The Plaintiffs have offered no legal authority for the proposition that an invitation to a speaking event entitled Dr. Wilson to enter a restricted area around a protected person, absent authorization by the Secret Service. And they put forward no evidence that Dr. Wilson had a right to enter the restricted area. For instance, they have not suggested that the Secret Service issued him a lapel pin or otherwise approved him. Nor do they claim, much less produce evidence to suggest, that the campaign submitted background information to the Secret Service before the event. While the Clyburn Fish Fry organizers approved the speaker list, the Secret Service decided who could enter the restricted area. Because it was illegal for him to enter the restricted area, there is no genuine dispute whether Dr. Wilson was prevented from giving his support or advocacy for his own campaign "in a legal manner." *See* 42 U.S.C. § 1985(3). For this reason, as well, the Plaintiffs' Section 1985 claim fails.

17

## IV.

For the reasons stated above, the DNC's Motion for Summary Judgment will be granted. A separate order will issue.

Dated: September 27, 2019                    TREVOR N. McFADDEN, U.S.D.J.